UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

           Plaintiff,

       v.                                   Case No. 22-CR-91 (LA)

MONTAE D. JACOBS,
A.K.A. "MAX," "CHEDDAR," "MILLY,"

           Defendant.

## UNITED STATES' TRIAL MEMORANDUM

The United States of America, by and through its attorneys, Gregory J. Haanstad, United States Attorney, and Erica J. Lounsberry and Kate M. Biebel, Assistant United States Attorneys, hereby submits this trial memorandum in advance of the bench trial scheduled to begin April 1, 2024. The memorandum contains a summary discussion of the nature of this case, including the elements of crimes charged against the defendant, as well as analysis regarding several evidentiary issues that may arise during trial and notices under Rules 404 and 609.

## I.   CHARGES IN THE SUPERSEDING INDICTMENT AND THEIR ELEMENTS

### A.  Overview

The fourteen-count superseding indictment in this case charges the defendant, Montae D. Jacobs, with two counts of sex trafficking by force, fraud, or coercion in violation of Title 18, United States Code, Sections 1591(a)(1) and 1591(b)(1); one count of

sex trafficking of a child in violation of Title 18, United States Code, Sections 1591(a)(1), (b)(2), and (c); one count of obstruction or interference with sex trafficking enforcement, in violation of Title 18, United States Code, Section 1591(d); nine counts of using the mail or facilities in interstate commerce to promote, manage, establish, and carry on a business involving prostitution, in violation of Title 18, United States Code, Section 1952(a)(3); and one count of coercion or enticement in violation of Title 18, United States Code, Section 2422(a). ECF 73.

### B. Elements of the Charged Offenses

#### i. Counts One and Two: Sex Trafficking By Force, Fraud, or Coercion, in violation of 18 U.S.C. §§ 1591(a)(1) and (b)(1)

In order to prove sex trafficking by force, fraud or coercion in violation of 18 U.S.C. § 1591(a)(1) and (b)(1), as charged in Counts One (AV-1) and Two (AV-2), the government must prove the following elements beyond a reasonable doubt:

1. The defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained by any means the victim identified in the indictment; and
2. The defendant knew or recklessly disregarded the fact that force, threats of force, fraud, or coercion, would be used to cause the victim to engage in a commercial sex act; and
3. The offense was in or affecting interstate or foreign commerce.[1]

Definitions of some of the terms used in the above elements are listed in 18 U.S.C. § 1591(e) and include, *inter alia,* the following:

The term "commercial sex act" means any sex act, on account of which anything of value is given to or received by any person. *Id.* § 1591(e)(3).

---

[1] These elements are taken from the William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit (2023 Ed.) (hereinafter, the "Seventh Circuit Pattern Instructions"), at page 748.

The term "coercion" means (A) threats of serious harm to or physical restraint against any person; (B) any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person; or (C) the abuse or threatened abuse of law or the legal process. *Id.* § 1591(e)(2).

The term "serious harm" means any harm, whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing commercial sexual activity in order to avoid incurring that harm. *Id.* § 1591(e)(5).

The term "abuse or threatened abuse of law or legal process" means the use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action. *Id.* § 1591(e)(1).

The definitions of "interstate commerce" and "foreign commerce" are found at 18 U.S.C. § 10 and are set forth in the Pattern Instruction on Definition of Interstate or Foreign Commerce, which reads as follows: "'Interstate commerce' means commerce between different states, territories, and possessions of the United States, including the District of Columbia. 'Foreign commerce' as used above, means commerce between any state, territory or possession of the United States and a foreign country. 'Commerce' includes, among other things, travel, trade, transportation and communication. Images

transmitted or received over the Internet have moved in interstate or foreign commerce."

Seventh Circuit Pattern Instructions at page 675.

The defendant need not have known or intended that his conduct would have any effect on interstate or foreign commerce. *United States v. Sawyer*, 733 F.3d 228, 230 (7th Cir. 2013); *see also* Seventh Circuit Pattern Instructions at page 751. Moreover, while the offense conduct must have affected interstate or foreign commerce, the statute does not require that the specific acts listed in 18 U.S.C. § 1591(a)(1) affect interstate or foreign commerce. *United States v. Wearing*, 865 F.3d 553, 557–58 (7th Cir. 2017); *see also* Seventh Circuit Pattern Instructions at page 751.

A completed "commercial sex act" is not an essential element of the offense. *Wearing*, 865 F.3d at 555–57; *see also* Seventh Circuit Pattern Instructions at page 750.

### ii. Count Three: Sex Trafficking of a Minor, in violation of 18 U.S.C. §§ 1591(a)(1), (b)(2), and (c)

In order to prove sex trafficking of a minor in violation of 18 U.S.C. § 1591(a)(1), (b)(2), and (c), as charged in Count Three (JV-1), the government must prove the following elements beyond a reasonable doubt:

1. The defendant knowingly recruited, enticed, harbored, transported, provided, obtained, or maintained the victim identified in the indictment; and
2. The defendant:
   a. knew or recklessly disregarded the fact that the victim was under eighteen years of age and would be caused to engage in a commercial sex act; or
   b. had a reasonable opportunity to observe the victim who had not yet attained the age of eighteen, and knew or recklessly disregarded the fact that the victim would be caused to engage in a commercial sex act; and

3. The offense was in or affecting interstate or foreign commerce.[2]

To the extent the Seventh Circuit Pattern Instructions provide definitions for any of the terms used in the elements described above, refer to Section I.B.i., *supra*.

### iii. Count Four: Obstruction or Interference with Sex Trafficking Enforcement, in violation of 18 U.S.C. § 1591(d)

In order to prove obstruction or interference with sex trafficking enforcement in violation of 18 U.S.C. § 1591(d), as charged in Count Four, the government must prove the following elements beyond a reasonable doubt:

1. The defendant obstructed, attempted to obstruct, or otherwise attempted to interfere with or prevent the enforcement of Title 18, United States Code, Section 1591; and
2. The defendant acted knowingly and intentionally.[3]

Because the superseding indictment charges the defendant obstructing, interfering with, preventing, and *attempting* to obstruct sex trafficking enforcement, the pattern attempt instruction is also appropriate here. That instruction reads as follows:

A person attempts to commit this offense if he (1) knowingly takes a substantial step toward committing the offense, (2) with the intent to commit the offense. The substantial step must be an act that strongly corroborates that the defendant intended to carry out the offense. *See* Seventh Circuit Pattern Instructions, General Instruction 4.09, at page 77.

---

[2] *See* the Seventh Circuit Pattern Instructions, at page 748.
[3] There is no pattern instruction in the Seventh Circuit for a violation of Section 1591(d). The elements listed herein are taken from the instructions delivered to a jury in a previous sex trafficking case tried in this district, *United States v. Freeman,* Case No. 19-CR-103-PP, ECF 103-1 at 39 (E.D. Wis.).

### iv. Counts Five through Thirteen: Use of the Mail or Facilities in Interstate Commerce to Promote, Manage, Establish, or Carry On an Unlawful Activity, in violation of 18 U.S.C. § 1952(a)(3)

In order to prove use of facilities in interstate commerce to carry on a prostitution business in violation of 18 U.S.C. § 1952(a)(3) (the "Travel Act"), as charged in Counts Five through Thirteen, the government must prove the following elements beyond a reasonable doubt:

1. The defendant used or caused to be used a facility in interstate commerce, including the mail; and
2. The defendant did so with the intent to promote, manage, establish, or carry on, or to facilitate the promotion, management, establishment, or carrying on of an unlawful activity, namely a business involving prostitution in violation of Wisconsin Statutes sections 944.30 through 944.34; and
3. Thereafter the defendant did attempt to promote, manage, establish, or carry on, or to facilitate the promotion, management, establishment, or carrying on of an unlawful activity, namely a business involving prostitution in violation of Wisconsin Statutes sections 944.30 through 944.34.[4]

Facilities in interstate commerce include, for example, telephone systems and the mail, *see, e.g., United States v. Peskin*, 527 F.2d 71 (1975); *see also* Seventh Circuit Pattern Instruction, Committee Comment, at page 795, and the Internet and email, *see, e.g., United States v. Shah*, No. 21-10292, 2024 WL 1000845, at *10 (5th Cir. Mar. 8, 2024) (Internet); *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 596 (S.D.N.Y. 2014) (email).

Although the Seventh Circuit has yet to address the issue, the other circuit courts that have done so have held that purely *intra*state communications via facilities of interstate commerce such as telephones, ATMs, and the mail satisfy the "facility of interstate commerce" jurisdictional element of the statute. *See United States v. Burke*, No.

---

[4] *See* the Seventh Circuit Pattern Instructions, at page 794.

19-CR-322, 2022 WL 1970189, at *25 (N.D. Ill. June 6, 2022) (citing cases).

"Unlawful activity" means any business enterprise involving prostitution, in violation of the laws of the state in which they are committed or of the United States. *See* the Seventh Circuit Pattern Instructions, at page 798. As discussed further *infra* in Section III.C, the Seventh Circuit has construed the term "business enterprise" to require more than an isolated event; the government must prove a continuous course of conduct. *See United States v. Clancy*, 175 F.3d 1021 (7th Cir. 1999).

Next, violation of the Travel Act does not require proof of a violation of state law; in other words, the state crime identified in the indictment need not have been completed. *United States v. Campione*, 942 F.2d 429, 434 (7th Cir. 1991); *United States v. Baker*, 227 F.3d 955, 961 (7th Cir. 2000); *Peskin*, 527 F.2d at 79 n. 3.

Finally, for the sake of completeness, the government provides in Attachment A the elements of Wisconsin's prostitution crimes as listed in the superseding indictment, which include: Prostitution, Wis. Stat. § 944.30, Patronizing Prostitutes, Wis. Stat. § 944.31, Soliciting Prostitutes, Wis. Stat. § 944.32, Pandering, Wis. Stat. § 944.33, and Keeping a Place of Prostitution, Wis. Stat. § 944.34.

### v.    Count Fourteen: Coercion or Enticement, in violation of 18 U.S.C. § 2422(a)

In order to prove coercion or enticement in violation of 18 U.S.C. § 2422(a), as charged in Count Fourteen, the government must prove the following elements beyond a reasonable doubt:

> 1.  The defendant knowingly persuaded, induced, enticed, or coerced the person identified in the indictment to travel in interstate commerce to engage in prostitution or sexual activity, or attempted to do so; and

2. The defendant or the other person identified in the indictment could have been charged with a criminal offense, namely prostitution, for the sexual activity.[5]

"Prostitution" means knowingly engaging in or offering to engage in a sexual act in exchange for money or other valuable consideration. *See* Seventh Circuit Pattern Instructions, Committee Comment, at page 983-84.

Because the superseding indictment charges the defendant with having attempted to violate Section 2422(a), the pattern attempt instruction is also appropriate here. *See supra* Section I.B.iii.

## II.    FACTS OF THE CASE

The government expects that the evidence at trial will consist of testimony from Jacobs' victims, victims' family members, and law enforcement agents, to potentially include local law enforcement officers who had contact with Jacobs and the victims during the offense conduct, Wisconsin Department of Corrections officers and probation agents, and the Wisconsin Division of Criminal Investigations special agents who investigated this case. Physical or records evidence presented through these witnesses will focus on the contents of several cell phones used by Jacobs or AV-1 that were seized and examined by law enforcement, including text messages, photographs, and videos; commercial sex advertisements; and a number of jail calls, emails, and letters placed or written by Jacobs during the last three years he has been in custody. It will also likely include records evidence, including records obtained from hotels, financial institutions, and other businesses.

---

[5] *See* the Seventh Circuit Pattern Instructions, at page 983.

The following is a summary of what the government expects each witness will testify to, and what the evidence will show about each of the fourteen charges in the superseding indictment.

## A. AV-1 (Counts One and Four)

AV-1 met Jacobs in late March 2019, when Jacobs approached her at a gas station at South 9th Street and West National Avenue in Milwaukee and offered to sell her crack cocaine. They exchanged numbers, and Jacobs began texting AV-1, offering to set up prostitution dates for her and provide transportation to and from the dates. AV-1 was not interested in his offer, however she remained in communication with Jacobs about buying crack from him. Within a few days, both AV-1 and Jacobs were arrested on warrants, however they reunited in May 2019 after they were both released.

At that time, Jacobs introduced AV-1 to a woman named Jessica who was performing prostitution dates for him in exchange for drugs. Jacobs also told AV-1 he was interested in a romantic relationship with her. Jacobs convinced AV-1 to cut off her court-ordered GPS monitor and to come live with him in Milwaukee. When she did, Jacobs also cut off his GPS monitor so that they could "go on the run" together.

Jacobs tried to get AV-1 to perform dates with Jessica, but because AV-1 believed she and Jacobs were in a romantic relationship, she did not want to share Jacobs' attention with Jessica. AV-1 told Jacobs either Jessica needed to go, or she would. Jacobs kicked Jessica out, but he soon told AV-1 that she needed to make up for money Jessica had been earning for him by doing prostitution dates. He took photographs of AV-1 and used them to post online commercial sex ads for her. He communicated with the men who

responded on his cellular phones, and he transported her to and from sex dates.

Over time, Jacobs became controlling and violent towards AV-1, particularly when she took too long on dates or did not bring back the amount of money that Jacobs had negotiated. Instances of violence included Jacobs striking AV-1 with an open hand and a closed fist, threatening AV-1 with a gun, and dragging her by her hair. Jacobs required AV-1 to give him everything she earned, and he sometimes strip-searched AV-1 if he believed she was withholding money from him.

In July 2019, both Jacobs and AV-1 were again arrested on warrants. AV-1 was arrested in late August 2020, and Jacobs was released in early December 2020. Jacobs was angry to learn that AV-1 had continued seeing a few of her regular clients without telling him and keeping the money for herself. Thereafter, Jacobs treated AV-1 more harshly and violently than before. Jacobs imposed a quota for AV-1 of approximately $1,000 per day and required her to accept dates she would previously have turned down, for example due to the low amount of money being offered or the nature of the sex act requested. He also began hitting her multiple times a week, leaving her with cuts and bruises to her face.

At times when AV-1 would stop responding to Jacobs or leave him, Jacobs would send AV-1, or anyone harboring her, threatening messages. One of Jacobs' most frequent threats was that he would report AV-1's prostitution activities to her probation officer and get her sent back to prison. Another was that he would expose AV-1's prostitution activities to her family, with whom Jacobs limited AV-1's contact.

In April 2021, Jacobs recruited AV-2 to engage in commercial sex dates for him. AV-1 was upset, as she had been over "Jessica," because Jacobs had convinced her that he

and AV-1 were boyfriend and girlfriend, so she openly antagonized AV-2 in an effort to get AV-2 to leave. This angered Jacobs, who repeatedly accused AV-1 of "fucking up his money." On May 10, 2021, texts between AV-1 and Jacobs show him threatening AV-1 with violence over this. In his texts, Jacobs tells her that her "disobedience" makes him want to treat her like a "ho," concluding, "I'm selling you all night."

The argument continued into May 11, 2021, when AV-1 was staying with one of her brothers who owned firearms. AV-1 locked herself in the basement of the home and called her father, saying Jacobs had come to the house threatening her and was "trying to pimp her out." Her father called 911. Meanwhile, Jacobs went into AV-1's brother's room, found his handgun, and put it on AV-1's bed. He texted AV-1 two photos of the gun and warned her that this was her last chance before he left with the gun. Shortly thereafter, the police arrived and discovered the gun on AV-1's bed. They arrested Jacobs for probation violations, including his prohibited contacts with AV-1, as well as for possession of the firearm. AV-1 returned to the house later that night and was also arrested for probation violations and possession of the gun.[6] AV-1 made disclosures to her probation officer, Jacobs' probation officer, and the South Milwaukee Police Department that Jacobs was trafficking her.

Jacobs continued to reach out to AV-1 from jail with phone calls and letters. He called her through a third party when she was also in jail, and he wrote to her and called her on her cell phone when she was in drug treatment at Meta House or in the community. Some of these communications concerned her continuing to work for him.

---

[6] After police found the text messages described above, only Jacobs was charged with possession of the firearm.

For example, Jacobs told her multiple times in July 2021 that she should "turn on her lesbian switch" and recruit some girls from Meta House to work for her after being released from rehab. In other calls, Jacobs talked to AV-1 about "busting moves" herself and "getting some cheese," meaning making money for him. These conversations caused AV-1 to be kicked out of Meta House, though she was later readmitted.

In January 2022, AV-1 was discharged after completing residential treatment at Meta House. Jail calls show that Jacobs immediately began calling AV-1 again and telling her to make money for him. On January 24, 2022, Jacobs also instructed AV-2 in a jail call to text AV-1, "Go hit up A1 he got a car for you and a new phone go get money my way." On January 26, 2022, case agents confirmed that AV-1 had begun posting commercial sex ads again.

Meanwhile, Jacobs learned that AV-1 had disclosed to law enforcement that he was trafficking her, and he began a letter-writing campaign to convince AV-1 to recant her statements. These letters were intercepted by Meta House and/or AV-1's and Jacobs' respective probation officers, who provided them to DCI. On June 21, 2021, for example, he wrote AV-1 a letter saying, "Recant it meaning change it. You take responsibility for the phones, using the phones, posting the ads but not wanting the content on your phone because you got a P.O., so you used my phone sometimes. Montae never forced me, turnt me out nor NEVER benefitted from your dates." He told her to do right by "us" and that if she did, "her King" would be out of custody that summer. Suspecting that AV-1 might be offered the opportunity to cooperate against him to lessen her own legal problems, he wrote, "I be thinking like what if they tried to put a bogus case on 'us' for that gun but

hey AV-1 if you testify on him that he was forcing you to prostitute we will dismiss your charge. Bitch you better be like NEVER."

In another letter written on August 1, 2021, Jacobs again told AV-1 to recant. "[W]rite a letter/affidavit stating that the statement/recording is false, you was mad and I had NO involvement of making ads and of course I didn't force you to hoe." He added, "I don't need no new charges, you know you want me with you."

In addition to writing several other letters to AV-1 on this topic, Jacobs attempted to enlist the help of a number of other people to ensure that AV-1 would not continue to cooperate with law enforcement in any sex trafficking investigation or testify against him. For example, on August 9, 2021, Jacobs called JV-1 and told her he wanted her to pretend to be his cousin "Nyla" in order to get a recantation affidavit from AV-1. He told JV-1 to expect a call from AV-1 soon.

On October 12, 2021, Jacobs wrote AV-3 a letter laying out instructions for obtaining a notarized affidavit from AV-1 recanting her statements about sex trafficking. The letter contained the verbatim language Jacobs wanted AV-1 to use in the affidavit, as well as a list of benefits AV-3 was supposed to bribe AV-1 that she would receive in exchange for writing the affidavit.

Jacobs also used a woman in Texas named "Cookie" to attempt to negotiate with AV-1. Jacobs has described Cookie as "a vet with a check," by which he appears to mean that she is a veteran of the commercial sex industry with financial means. Jacobs also boasts in some of his communications that he has Cookie wrapped around his finger. In several of Jacobs and Cookie's calls immediately following Jacobs' federal indictment, in

May 2022, they discussed AV-1, the charges pending against Jacobs, and the desirability of getting a dismissal or a favorable plea offer. Jacobs asked Cookie to write to AV-1 on Facebook because he did not have her phone number. He advised Cookie not to "run her off" by talking too directly about the indictment, but instead to "reel her in." A few days later, Jacobs told Cookie she needed to ask AV-1 if she communicated with "them" (law enforcement) since the time of her arrest, and that it was important not to send her a "nasty letter." Cookie advised Jacobs that he needed to do "whatever it takes" to keep AV-1 on his good side. Jacobs agreed.

### B. AV-2 (Count Two)

AV-2 first became involved with Jacobs in early April 2021. At that time, AV-2 was homeless, unemployed, and addicted to heroin, the result of an addiction to opiates she was prescribed following two surgeries in her teen years. Jacobs responded to a commercial sex ad that AV-2 had posted online, posing as a john, although he had no intention of paying her for a date. Jacobs began texting with her regularly, suggesting he was interested in her romantically and gradually proposing that he could help arrange rides for her. Approximately a week into their communications, AV-2 found herself without a place to stay, and she decided to reach out to Jacobs for help.

After Jacobs picked AV-2 up, he began talking to her about doing dates for him, claiming he could help her make a lot of money. AV-2 was surprised to learn that Jacobs was a pimp and that he already had another girl (AV-1) working for him, however she had nowhere to go, and she was attempting to save money so that she could be reunited with her children, so she stayed. Jacobs created online commercial sex ads that he used for

both AV-2 and AV-1, as reflected in numerous texts with johns on his phone. Jacobs also connected AV-2's ads to a Google Voice account that allowed him to monitor her conversations with johns on his phone.

Jacobs told AV-2 that their primary goal would be to rob would-be johns by collecting payment for the promised sexual services but not following through with the date. For this reason, Jacobs set up most of AV-2's dates to take place at his "uncle's" apartment, where Jacobs or his uncle would be waiting to scare the johns into leaving as soon as the money was in hand. Jacobs also set AV-2 up for "normal" sex dates, where no robbery was intended (or where a robbery was not possible). During these dates, Jacobs would wait outside in the car outside while AV-2 performed the sex date.

Although Jacobs never used physical violence against AV-2, AV-2 believes this was a calculated decision on Jacobs' part, as he knew she had previously fled physically abusive relationships. However, Jacobs intimidated AV-2 with the threat of violence by telling her or suggesting to her that his enforcer, an associate of Jacobs called "Country" with a known history of extreme violence, could be called on at any time. AV-2 did witness Jacobs punch AV-1 on two occasions, however, and she also heard him threaten AV-1 with violence over the phone, such as when they were late to meet Jacobs.

Jacobs used other nonphysical means of defrauding and coercing AV-2. For instance, Jacobs required AV-2 to give him all the money she made from her dates, as well as her food stamps. Jacobs continually assured AV-2 that this was just for safekeeping, however Jacobs would never allow AV-2 to have even part of her money, and AV-2 soon came to understand that Jacobs had no intention of ever returning it.

Jacobs controlled when and how much AV-2 ate, typically only allowing her one fast food meal a day and otherwise only supplying her with cigarettes, soda, or candy from a vending machine or gas station. Jacobs also required AV-2 to make him at least a few hundred dollars before he would give her or allow her to use heroin, and he would not allow AV-2 to do dates in direct exchange for drugs. This kept AV-2 in constant risk of withdrawals if she did not earn enough to satisfy Jacobs, and very painful physical condition that she sought to avoid at all costs.

AV-2 told Jacobs on several occasions that she wanted to leave, but Jacobs would pressure her to stay by taking her phone away or giving her more drugs. On one occasion, Jacobs had his associate "Country" watch AV-2 and prevent her from leaving while Jacobs was away. AV-2 was afraid of Country because, at the time, he was wanted for shooting his girlfriend, whom AV-2 had seen with her arm in a sling. Jacobs dropped AV-2 off at the American Inn in Milwaukee with Country and his girlfriend. Jacobs also took AV-2's phone and gave it to Country. Country locked the door to the hotel room, pushed the bed in front of the door, and kept AV-2 in the room for the rest of the night. Country also lectured AV-2 about how she needed to be grateful for everything Jacobs was doing for her. Jacobs returned the next day to retrieve AV-2.

Jacobs also controlled AV-2's contact with her family. For example, Jacobs drove AV-2 to Lake Geneva for a family birthday party but then only allowed her to stay for about 20 minutes. AV-2's mother was upset when AV-2 had to leave, but she knew Jacobs was waiting for her outside, and he had threatened to come in and cause a scene if she did not return promptly. Jacobs then used the fact that he knew where AV-2's mother lived to

make veiled threats about finding her or harming her family if she left him.

After several weeks, AV-2 found an opportunity to leave Jacobs when he took her to the Motel 6 in Glendale. Jacobs and AV-1 rented a room, but they left AV-2 outside. AV-2 first stayed in the car, then later went into the lobby. After some time passed, AV-2 realized that they were not coming back anytime soon. Even though all of her belongings were locked in the trunk of Jacobs' car, she recognized this as her opportunity to escape and left. A few days later, Jacobs offered to return AV-2's belongings and to give her the money she had earned while with him. When AV-2 met up with Jacobs, however, he took the money she had on her, did not return anything of hers that he had kept, and left. Following this incident, Jacobs continued to try to persuade AV-2 by phone to return to him, but AV-2 was not interested.

After Jacobs was arrested, he reached out to AV-2 on multiple occasions. On July 25, 2021, he called her from jail and talked about her getting a house where she could produce pornographic webcam content with some girls he said were 19 or 20. After this, AV-2 largely ignored Jacobs' calls. On February 5, 2022, AV-2 received a text from a number she did not recognize that read, "Damn this montae wassup let me guess that crazy white bitch hot a hold of you and now u not answering my calls?"[7] Jacobs continued to try to contact AV-2 through April 2022, calling her approximately 50 times, however AV-2 did not answer his calls.

---

[7] Ever since his May 11, 2021 arrest, it has been common for Jacobs to call members of his family and to dictate text messages to them to be sent to his victims and other women he was attempting to recruit or get money from.

### C.  JV-1 (Count Three)

JV-1 first met Jacobs through her older sister, M.W., in approximately December 2020, a few months after JV-1's 17th birthday. Jacobs was trying to get M.W. to work for him doing sex dates, and he had offered to let M.W. use a car he owned in order to do so. Jacobs would often call or video chat with M.W., and when he saw or heard JV-1 in the background of these calls, he asked to talk to her too. M.W. and JV-1 were very interested in having access to a car for their own purposes, so they acted as though they would consider doing dates for him. Texts between Jacobs and various johns show Jacobs posing as AV-1 and offering M.W. for sex, but many culminated in Jacobs telling the johns M.W. was not available after all, or that she had "freaked out" or changed her mind.

Sometime in the spring of 2021, Jacobs reached out to JV-1 on Facebook. He told her she was prettier than her sister and that he saw potential in her to make good money by performing commercial sex acts, going so far as to promise that they would be millionaires if she followed his instructions. JV-1 had told Jacobs her true age when they first began talking, so Jacobs told JV-1 she should lie about her age when interacting with johns.

These solicitations continued after Jacobs was arrested on May 11, 2021. Jacobs repeatedly called JV-1 from custody and asked whether she and M.W. would be willing to have sex with men for money. Jacobs wanted them to use his car to meet regular clients who formerly did sex dates with AV-1 (who at that time was also in custody), and he expected them to put money from these dates on his books. Jacobs was cautious to use coded language on the phone, and he sometimes scolded JV-1 for talking more plainly,

however JV-1 says Jacobs was more explicit about wanting her to do sex dates in letters that he mailed to her.

One example of such a call took place on August 4, 2021. Jacobs told JV-1 that she needed to start "busting moves," a euphemism for engaging in commercial sex dates, because he needed money right away. He instructed her to go to the car auction with his uncle to get a vehicle.

On August 10, 2021, Jacobs again told JV-1 that he really needed her to make some moves. He told her to get in touch with a regular client of AV-1 whom he claimed was a millionaire. When JV-1 asked Jacobs what explanation she should give for how she had gotten the client's contact information, he told her to say it was from "that website," which JV-1 understood to mean skipthegames.com, an escorting site Jacobs had told her about. Jacobs said he wanted to "fuck with" JV-1 but asked her to confirm that she was in her last year of school to make sure "everything is cool." JV-1 said she was in her senior year of high school and that her birthday was coming up in September, meaning that she was still only 17.

The next day, August 11, 2021, Jacobs spoke to JV-1 about making a profile online to sell pornographic videos of herself. When JV-1 asked him, "You don't have to be 18, do you?," Jacobs quickly replied, "Come on, my n****, you 18." When JV-1 persisted and said she was referring to skipthegames.com, Jacobs told her to "stop talking crazy over the phone." Jacobs told JV-1 she could make "Gs," meaning thousands of dollars, by doing "webcam stuff" and that he was going to mail her a letter telling her what to post on social media and skipthegames.com. Jacobs also told JV-1 that she had better "look out

for" him, meaning take care of him financially, because he was going to "put her up on game," meaning teach her about the prostitution lifestyle. He also urged her to take the Plan B pill to avoid pregnancy.

The next day, August 12, 2021, Jacobs told JV-1 that she needed to be loyal and to keep this between them. He explained that she should start viewing everyone as a dollar sign and talked about making money off of "Millionaire Jim," another one of AV-1's former clients. When JV-1 expressed some hesitation, Jacobs told her he didn't care if she needed a shot of Patron to alter her mind and help her focus on the money. Jacobs also bragged about how Jim had once paid Jacobs to watch Jacobs and AV-1 have sex at a hotel.

In addition to these and other calls, JV-1 says Jacobs did write her the type of letter he discussed in one of their calls on August 11, 2021. The letter detailed the websites JV-1 should use to post ads, language to use in the ads, the phone numbers of potential regular clients, how much to charge for sex acts and pornographic videos, and how to put Visine in men's drinks in order to cause them to fall asleep or pass out so she could rob them. JV-1 did not keep the letter.

In August 2021, JV-1 began a dating relationship with someone else and stopped answering Jacobs' calls. Jail records show that Jacobs attempted to call JV-1 38 times between August 15, 2021 and August 28, 2021, however she did not answer those calls.

### D. AV-3 and AV-4 (Counts Five through Fourteen)

Jacobs has been in state custody since his arrest on May 11, 2021. From that time, through at least March of 2023, Jacobs continuously attempted to groom and recruit new

victims to engage in commercial sex acts in Wisconsin and elsewhere and to share the proceeds with him by depositing money into his commissary account. Techniques he used to identify potential victims included having people send him phone numbers for attractive females found in online commercial sex ads (not unlike his tactics while out of custody), asking friends and family members to comb through his contacts on Facebook for "hoes" he can reconnect with, soliciting names and phone numbers for females from fellow inmates, and having females he is already speaking to refer other females to him. While Jacobs often encourages the females to make money by creating on-demand pornography, gaming "millionaires," or trying to start online businesses that sell things like cosmetics and lingerie, he also frequently directly promotes "selling pussy."

The government identified several women residing in the Eastern District of Wisconsin whom Jacobs targeted, including AV-3 and AV-4. Through a combination of letters, recorded calls, and emails, Jacobs attempted to encourage, coax, cajole, coach, and, in some instances, demand that they engage in acts of prostitution. In the case of AV-3, he also put significant pressure on her to move to Texas to engage in prostitution there under Cookie's guidance and direction.

### i. AV-3 (Counts Five Through Ten and Count Fourteen)

AV-3 was first contacted by Jacobs in the summer of 2021 while he was at the Dodge County Detention Facility after a friend of AV-3's who was incarcerated with Jacobs gave Jacobs AV-3's contact information. Jacobs called AV-3 frequently, asking her to contact third parties for him, sending her information on "tricks" she could contact to make money, and talking to her about starting a business. One of the third parties Jacobs

wanted AV-3 to help him communicate with was AV-1. At the time, AV-1 was in treatment at Meta House, and AV-3 would facilitate three-way calls between them. Jacobs would tell AV-3 that he only needed to keep AV-1 on the hook long enough to get her to recant, and then they could cut her out and pursue a romantic relationship and a business partnership without her.

In approximately October 2021, Jacobs arranged for AV-3 to pick up a Nissan Altima from his grandfather's house with the understanding that she would use the car to get to and from sex dates. Jacobs also offered to have a friend drive AV-3 to dates, but she declined. Jacobs often encouraged her to keep doing dates rather than finding a legitimate job, telling her that she could become rich that way, rather than living paycheck to paycheck in a 9-to-5. Jacobs also began keeping tabs on whether AV-3 was posting online commercial sex ads and would become upset with her when she did not.

Jacobs encouraged AV-3 to get involved with three wealthy "tricks" who were formerly clients of AV-1. Two of them turned her down as soon as she mentioned her affiliation with Jacobs (which Jacobs had assured her would be a selling point), however the third, Scott, became her regular client for commercial sex dates. Around November or December 2021, Scott asked AV-3 to move in with him, however AV-3 declined because Scott made racist remarks about her biracial children and would not allow her to bring them to his home. Jacobs became very upset with AV-3 over this decision, causing her to realize that Jacobs did not care about her, as he had claimed; rather, he only cared about making money off of her.

During this time, Jacobs wrote AV-3 a number of letters, which he sent via U.S.

mail to her home in Milwaukee from Dodge County Detention Facility (early October 2021) and Stanley Correctional Institution (after October 21, 2021). These letters urged AV-3 to increase the frequency with which she engaged in prostitution dates, to seek out wealthier clientele, and to send Jacobs part of her earnings. Several of them also concerned Jacobs pushing AV-3 to travel to Texas to prostitute there, and to use that as a base of operations for prostituting in places even further afield, like Miami, Florida.

AV-3 stopped speaking to Jacobs near the end of 2021 because he was becoming angry and threatening toward her over her decision not to move in with Scott, and for failing to comply with his directions more generally. In one call that took place in approximately November 2021, Jacobs told AV-3, "Don't think you can't be touched, just because I'm in here." AV-3 believed Jacobs would potentially use friends on the outside to harm her, and she was afraid.

After a hiatus, Jacobs resumed contacting AV-3 at points in 2022 and 2023. AV-3 initially answered because Jacobs called her through an unexpected third party rather than directly, and she did not realize it was him. She continued to answer his calls because she was afraid what might happen if she refused him or cut him off. Jacobs continued to talk to her about selling pornographic content online and finding rich "sponsors" (meaning johns), and he insisted that she should never do anything for free. Jacobs also sent AV-3 more letters, however she and her family threw them away.

The following are summaries of the evidence the government will offer at trial in support of the charges in Counts Five through Ten and Fourteen.

### a. Counts Five and Fourteen

On October 3, 2021, Jacobs sent AV-3 a 12-page letter in which he characterized himself as uniquely suited to access her "untapped potential" and put her in a position to "win." He made effusive promises to her about being her best friend, confidant, and business partner and how they would soon become millionaires if she followed his directions. He exhorted her that "fucking" should always be "for a FEE never FREE" and that now was the time to "run it up," helpfully doing the math for her that "$50 dollar specials x 100 calls = $5,000," with an estimated 10 calls (meaning sex dates) per day being profit and "the rest" covering expenses. He urged her to make a new ad for prostitution websites such as skipthegames.com and gave her the full text he wanted her to use, which talked about selling pornographic photos and videos of her, as well as soliciting "venture capital" and "free mentorship" from millionaires. He also laid out complicated schemes for stringing along wealthy men with promises of sex in order to milk as much money out of them with as little effort as possible.

Jacobs emphasized that there was more money to be made in Texas and that AV-3 should use "that car" to get down there by the end of the month. He added that if, from there, she wanted to drive to Dallas or fly to Houston or Miami, Cookie would watch her kids while "network[ed]." Later in the letter, he gave an example of what he meant by this, describing her going to a "yacht party" in Miami in expensive clothes so that she could "knock a rich one and use [her] sexuality in various ways" to get money. Jacobs said he had informed Cookie that AV-3 would be coming down and that he wanted AV-3 to help Cookie get up to speed on "working the internet, networking, and putting

concepts into effect."

Jacobs wrapped up his letter by alluding to the fact that he felt AV-3 was making excuses for not sending him money, telling her, "Never bite the hand that feed you and what you really doing? You got a pussy, it's no drought on that, you got BEAUTY, etc. Man you should've been stacked a couple thousands since you got that car. You do need some guidance!... [S]top being so emotional." Seemingly suspecting AV-3 was giving her money to someone else, he wrote, "All I'm saying is don't let 'NO NIGGA' before me, benefit from an outlet given to you through me!" He then returned to talking about Texas, saying Cookie would do whatever he told her to do, and he could introduce her to a rich "fuck buddy" in Texas so that she could "break bread," or share her earnings, with him. He told her he was a 'P' (pimp) for real, not a sucker, and that she needs to answer his calls, signing his letter "Notorious B.I.G./P. Daddy- Victorious."

In addition to this letter, AV-3 will testify that in various calls and letters between approximately October 3, 2021 and November 21, 2021, Jacobs repeatedly pushed AV-3 to move in with Cookie in Texas and earn money there through prostitution, some of which was to go to Jacobs. AV-3 went so far as to change her address with her bank to Cookie's address and to have a going-away party with friends and family in anticipation of moving. At the last moment, Jacobs did not come through with providing AV-3 a truck she was going to use to move, and so she never ended up going. Jacobs was upset with her over this fact.

### b. Count Six

On October 12, 2021, Jacobs wrote to AV-3: "Just listen to me and do as I say, you

ah be O.K. You make that ad, you gonna rake in thousands within 24 hrs. Bae when you selling pussy, you gotta go HARD in the YARD, FR. It's not to get by for this day, you tired in the morning (missed rush hr traffic), you gotta catch all them POPS, nobody should be fucking for FREE. You need a DADDYY that comprehend you and att understand your short-term, long-term goals. I'm ah motivate you to meet me 50/50. Dig That. We on a earning commitment, I wish I was out with you, I can stand on you assertively not aggressively, you ah NEVER deny me!" He then told her that he envisioned her supervising AV-1, saying, "Hell yeah we gonna get that $ she bring in, we gonna keep her on the hook. Friends close enemies closer!" He concluded with the outline for the recantation affidavit he wanted AV-3 to obtain for him from AV-1.

### c. Count Seven

On October 18, 2021, Jacobs wrote AV-3 instructing her to "delegate to elevate" by recruiting other women to prostitute for him. He suggested she start by selling them drugs to strippers and paying for lap dances with them in order to get their attention. He also gave her a list of "hoes" he wanted her to contact on Facebook. The list included AV-2, JV-1 and her sister M.W., and more than a dozen other females (including a "mom/daughter" whom he claimed had a "history of 2 girl specials.") He offered that his 73-year-old grandfather who "smokes dope" could watch her children for her while she did these things because "[h]e a player and know how shit go" and would be "cool" to do it in exchange for "some drop and/or chump change," so long as she reassured him that she was Jacobs' girl and was getting money for him.

He also continued to talk about needing to get AV-1 to trust AV-3 so that the two

of them could work together. He then discussed his philosophy regarding business before pleasure: "I just need a SOLID STUMP DOWN BITCH, you can't trip on me if everything I do revolves around $$$, it's just BUSINESS… Don't get me wrong, I love to fuck, it's just so many I passed up. TBH I rather have a bitch fuck for a buck before I passed around giving nuts. PERIOD. Like as long as your sex GAME A+, Fantastic, I don't even get side tracked on fucking another bitch, FACTS. I just want the $, I'm a charmer, conversationalist, and I ah fuck these girls minds not pussy; they gone chase the dog, instead of me chasing the cat, PERIOD." He then told her that, for now, she should "do what you do" (meaning commercial sex dates) but promised that, "soon we ain't never going back to what we use to do" because they would be rich.

### d. Count Eight

On November 7, 2021, Jacobs wrote to AV-3 that he wanted her to be his "BOSS BOTTOM BITCH" and promised that, in time, they would become husband and wife. He told her, "I know you ah sell some pussy for US, hands on, I know I point you in the right direction, you gonna get that $ baby, shit ain't no shame in my game, you can turn infinite dates in a day, when it's time to lay up with me, you gone be fresh & clean, I ah tongue you down like no dicks been in your mouth. You don't have to be shy or lie to me about ANYTHING. Just know that I'm your MATCH, I can tolerate you, handle you, LEAD you, and stand on you when necessary. Like just give total/complete submission to me and QUIT with the doubts. FR. Aye you the one that ah do what I say, on front line and come through like a soldier, FR. Yes, you been through some shit, now you with the SHIT, a lot of FLIES over here in this circle!... So hold US down, we will conquer our biggest

goals together, you know realize dreams/fulfill fantasies, and LIVE LAVISH. Just make motion, progress everyday, add up, and when I get out the rest is HISTORY…" He concluded with a request that she send nudes and signed the letter "DADDYY."

### e.  Count Nine

On November 10, 2021, Jacobs continued to write to AV-3 about his expectations for her engaging in commercial sex acts, saying, "I need you 10 toes down for me, wit' intentions to get US up, like bae I made this money, here you go, we invest in what?… Never blow my cover and every date you turn make sure that you use a rubber, always save more than you spend, PERIOD! Don't never be comfortable, keep going like you trying to reach a quota to bail daddy out, like IDC how much it is, I got this pussy and it's POWER, he getting out!" He also warned her, "Just control yourself [AV-3], I will be <u>100</u>, with you, I'm use to a high lifestyle, it's only about to be #LAVISH. So know you with me, never switch and go against me. FACTS."

### f.  Count Ten

By November 21, 2021, Jacobs showed signs of becoming frustrated with AV-3 that he was making very little money off of her. He wrote her saying, "Baby I need you to fuck the UNIVERSE, like stop slacking… I'm accustom to a girl being down for me and her, providing for US, listening to me, believing in me, being comfortable with me, and having NO PROBLEM with her giving her completely to me (mentally, spiritually, emotionally, physically) and breaking break [sic], you know make sure a real one STR8. For it's nothing you want [sic] do for US, SUBMIT BAE!" He told her, "You turn me on when you sell that pussy baby" and urged her to "<u>GO HARD</u> with it." He also admonished her that

they needed to watch what they said over the phone.

Jacobs then renewed his enticements for AV-3 to travel to Texas to make money from prostitution: "I do WANT you to go down SOUTH, A.S.A.P. FRFR. Go put that pussy on a lifetime PLUG, go knock some millionaires and bring in them RICHES MA." He repeated that even though she was "selling pussy" at that time, when the time was right, they would become husband and wife. He said that one day when he was out of custody, it would be his turn to prove himself to her, but right now, it was her time to prove herself to him. After describing all of the sexual things he would do to her, he wrote, "On some real shit bae, it's time to start FULL-TIME selling pussy. Make a quota, set a schedule, pick a location, and execute." He gave her his grandfather's phone number and again offered that he would watch her kids, and he reminded her that "the ultimate payout is in Texas." He told her, "When you come UP break bread with DADDYY. We stuck with each other, too much been inverted [sic], I don't believe in QUITS, hell naw, you belong to me, I stimulate your mind, give you vision, motivate your hustle, irritate your soul, and enlighten you on goals, FACTS. You know you fuck with me, as you reading this RN, tell yourself I'm giving all of me to him, PERIOD. You know that the reward is greater than the risk, and the pros outweigh the cons." Jacobs signed the letter "Daddyy 100."

### g. Additional Evidence for Count Fourteen

Jacobs also called AV-3 about many of the same subjects that he wrote about in his letters. On October 10, 2021, for instance, Jacobs called his "Uncle Al" from DCDF and had him get AV-3 on the line. Right away, Jacobs asked AV-3, "Why didn't you make that

new ad like I told you to?" AV-3 told Jacobs she had to wait because the website in question was limiting her to posting on a specific day. AV-3 offered to instead post on a different website she had used in the past. Jacobs replied, "Yeah, baby, that ad gonna make Gs. I ain't gonna lie to you, that one gonna go through the roof. Make that one as soon as possible." Jacobs then talked with AV-3 about whether she was going to go to Texas, where Cookie lives. Jacobs told her he wanted her to go down to Texas to get their "business" going.

### ii.    AV-4 (Counts Eleven through Thirteen)

Like AV-3, AV-4 was first contacted by Jacobs after a friend of hers who was in custody with Jacobs gave Jacobs her contact information. In approximately March of 2023, Jacobs called her purportedly on behalf of that friend to explain that the friend had been placed in solitary confinement and would not be able to call her for some time. Jacobs segued to telling AV-4 that he was impressed with her voice and the way that she handled herself, and he persuaded her to continue accepting calls from him.

The subject of Jacobs' calls to AV-4, as well as multiple letters and emails to her, very quickly turned to making money, particularly through prostitution and live pornographic webcam performances. Although Jacobs assured her that he was simply a kindhearted person who was interested in seeing women to succeed in life, his written communications to her speak for themselves.

The following are summaries of the evidence the government will offer at trial in support of the charges in Counts Eleven through Thirteen.

### a. Count Eleven

On March 7, 2023, Jacobs emailed AV-4 from Corrlinks, a fee-based email system available to inmates at various correctional facilities, including Stanley Correctional Institution, where Jacobs was housed at the time. He boasted about the value of the "game" he was giving her, meaning his advice about the prostitution business, and he warned her not to be fake with him, lest karma take its toll. He told her, "Remember this besides CHRIST my religion is 'FREE IS NEVER.' Whatever you do in life you should get paid for it. So remember it's a FEE & never FREE!" He asked her to make an account on skipthegames.com and gave her an ad layout so that she could sell pornographic images and videos of herself. He listed a large number of "party," "entrepreneurial," and "generous" cities in which the ad should be posted, as well as a list of business ventures she could claim she was starting up in order to get money from men (e.g., online lingerie sales and "a management agency for girls who like to dance, webcam, barmaid, dominatrix, etc."). He told her he would show her numerous ways to "knock sponsors," start businesses, and make money creatively, such as with a sham green card marriage. He concluded his email, "Remember if it ain't about no $, its not about shit, Period." He also promised to send her a letter that night.

The letter, which was postmarked on March 8, 2023, arrived at AV-4's address in Waupun, Wisconsin via U.S. mail in an envelope bearing Jacobs' inmate number and return addressing information. He began by telling AV-4 he was ok if she "parties" (meaning uses drugs) so long as she is able to function and keep control over herself and her surroundings. He then told her that when she posts the ad described in his email, she

will inevitably be asked whether she is selling sex. He wrote, "[To be honest], I rather anybody be for a fee then [sic] for free," indicating in explicit terms that he himself would never agree to have sex with someone who was not paying him (or earning money for him). He then told her that he was going to explain acronyms and terms commonly used for discussing sex dates so that she would know what johns were telling her, if that's the route she decided to go. Although he said the choice was hers, he also added, "You either will or you won't. You either got it or you don't! It's no almost or close! You either in or out!"

Jacobs then defined terms like BBBJ ("bare-back blowjob"), CIM ("cum in mouth"), GFE ("Girl Friend Experience [Kissing/Hugging]"), and in-call ("your place [they come to you]"). When describing an outcall (meaning a commercial sex date performed at the john's location), he advised her never to do a date at a hotel and claimed this was the only place where police worked sting operations. He also instructed her never to let law enforcement "trick" her, to always claim to be independent, and to invoke her right to counsel. He laid out additional rules, too, such as making sure to get paid up front, prices for different date durations, to terminate a date as soon as the john ejaculated regardless of the amount of time they paid for, and to never do dates with younger black males (due to his concern they would be "thugs/pimps"). He peppered his letter with rhyming slogans about prostituting, such as "GET PAID TO BE LAID," and "Your NETWORK is your NETWORTH." After laying out everything he felt she needed to know to make an ad, he wrote, "Sorry if I came at you side ways but this is what I know. I like to deal with girls who ABOUT THEIR $. I'm into coaching girls to get $ and make investments!" He

went on to explain that he had plenty of other business opportunities he could extend to her after she had first made sufficient money from prostitution and web cam work. He concluded by asking her a number of questions about her hopes and dreams, then told her, 'Aye, check it out, get on your paper route. A sponsor/trick/sugar daddy waiting on you via internet. Tap in, get it in, make it count, invest to secure your future."

### b. Count Twelve

On March 13, 2023, Jacobs used the Internet to send AV-4 another email, which she received while at home in Waupun. He reprised themes he often took up with AV-4 about making money for everything she does, following his instructions, and "breaking bread with daddy." He told her having sex for free was "disgusting," and he stressed, "Get $ baby! Stop over thinking things, what I'm telling u makes sense! Rather it be non-contact(content sales) or hands on meetings, get your $! You already like to be sexually active, why not cash in? It's a no brained, duh! Make daddy happy and get that $! Start networking, building connections and running up that $! Every day u should get $..." He urged her to find a sugar daddy and boasted that he himself had a "vet" in Texas and a "cougar" in San Francisco who bankrolled him. He concluded, "I love women, I love bunnies, I love sex, money, power, etc. I love to be a BO$$! Baby stop bullshitting and do as I say!"[8]

### c. Count Thirteen

On March 14, 2023, Jacobs mailed a second letter to AV-4's home address in Waupun in another envelope with Jacobs' name, inmate number, and the return address

---

[8] "Bunnies" is short for "snow bunnies," a term used to refer to white females who engage in prostitution.

information for Stanley Correctional Institution. Jacobs included a visitation form, as well as instructions for putting money on his commissary account, telling AV-4, "[O]nce you start making $, take care of Daddy, when the time is right." After pepping her up that she was a "prize," "priceless," and "somebody," he told her, "[Y]our time has arrived, it's time for you to bust moves like gym shoes. L.B.V.S. Honestly, do you know how much you can ACCOMPLISH by manipulating the UNIVERSE with that PU$$Y. My dick get HARD when a girl down to break a trick/john/date/sponsor for that $, you know that pussy, head, etc; is mean to be PAID for! I ♥ IT! You can get RICH off it baby, that FIRE pussy & wet mouth performed on a RICH trick, will get you EVERYTHING you WANT & MORE, like shit you can't even imagine. I do want you to buss Daddy pussy open for a fee, make that $ baby, stack it up & invest! #BO$$BITCH I want you to tell me like DADDY I got them racks put up, I did X, Y, Z. Shit easy ABC-123." He then told her that when a girl is down for her guy, she is worth settling down with when the timing is right. He emphasized, "I don't want nobody in that pussy for FREE! They must pay, IDC how good they look or how good they may fuck. You gotta view them as a dollar sign! Dicks & nuts come &go! Those things not going to pay the bills, but a pay to play will. Ultimately you will encounter a primary 'SUGAR DADDY' a safety net allowing you to make the right moves, to continuously ELEVATE." He signed the letter "Daddyyy." He also included a one-page "vision board" to inspire her, which included the names of various commercial sex sites, and slogans meant to encourage her, such as "Power of that 'P'ussy!," "SEX SELLS ONLINE & IN PERSON," and "FACTS is you don't HAVE to LOOK LIKE A MODEL TO GET RICHES!"

### E. Additional Witnesses

In addition to the five victims in this case, the government will call additional witnesses to corroborate their accounts, either by testifying to their own observations or by introducing additional evidence to support their testimony. These witnesses may include the following:

### i. Wisconsin Department of Criminal Investigations Special Agents.

The United States anticipates calling two special agents from Wisconsin DCI, Melissa Fus and Hanns Freidel. Special Agent Fus will testify about evidence collected via subpoenas and search warrants in this case. In particular, she will introduce evidence collected from the digital forensic examinations of three cellular phones belonging to Jacobs that were seized at the time he was arrested on May 11, 2021. These will include records of Jacobs' online activity with respect to commercial sex websites, numerous text messages between Jacobs and various johns setting up commercial sex dates, photos and videos captured on Jacobs' phones, and messages between Jacobs and AV-1 wherein Jacobs attempts to control AV-1 and to compel her to continue making money for him through the use of various types of threats.

Special Agent Freidel will testify about Jacobs' jailhouse communications, collected from the institutions where Jacobs has been incarcerated since May 2021 and reviewed by case agents. Specifically, Special Agent Freidel will summarize and introduce communications between Jacobs and third parties other than the five named victims that provide direct evidence of the crimes charged. For instance, Special Agent Freidel will cover communications between Jacobs and individuals such as Cookie or his mother,

Regina Smith, concerning his efforts to obtain a recantation affidavit from AV-1. He will also testify regarding communications between Jacobs and a number of women whom Jacobs has attempted to recruit for his prostitution business while in custody, evidencing not only the extent and seriousness of Jacobs' scheme, but also his motive, intent, plan, identity, and modus operandi when communicating with the named victims. This is further discussed below in Section III, Subsection C. ("Rule 404(b) Notice").

### ii. AV-1's father and brothers.

The United States may call AV-1's father and one or both of her brothers to testify about their observations while AV-1 was with Jacobs. Generally, AV-1's family observed that AV-1 struggled to follow the rules of her probation or to stay home or clean of drugs when Jacobs was out of custody, versus when he was in custody. AV-1's father would testify to excited utterances that AV-1 made to him on May 11, 2021 while locked in the basement of her brother's home, telling him Jacobs was threatening to pimp her out and that she needed help. AV-1's brothers would testify that after Jacobs was arrested that day, they found a duffel bag in AV-1's room that did not belong to her, and that inside they found a notebook tracking AV-1's earnings from prostitution and a phone containing evidence of Jacobs prostituting AV-1.

### iii. AV-1's and Jacobs' former probation officers.

The United States may call AV-1's 2021 probation officer, Michael Peterson, or Jacobs' 2021 probation officer, Nicholas Wintergerst, to testify about various subjects related to Jacobs' trafficking of AV-1 and his attempts to obstruct the investigation into that conduct. They will establish that they instituted a mutual no-contact order between

Jacobs and AV-1 in early 2021. Additionally, they will explain how they intercepted and collected a number of letters that Jacobs wrote to AV-1 while she was in residential drug treatment and discovered both that Jacobs was attempting to continue to prostitute AV-1 for his financial benefit, but also that he was attempting to obtain an affidavit from AV-1 recanting statements she had made to them and to multiple law enforcement officers about Jacobs trafficking her for commercial sex.

### iv. Ministerial witnesses.

The United States intends to introduce records evidence obtained via grand jury subpoena or official law enforcement request, such as commercial sex advertisements, hotel records, and Jacobs's jailhouse communications from the Milwaukee County Jail, the Milwaukee Secure Detention Facility, the Waukesha County Jail, the Dodge County Detention Facility, and Stanley Correctional Institution. The United States is awaiting Jacobs' response with respect to a number of proposed stipulations that would obviate the need for calling records custodians to attest to the authenticity and chain of custody of these exhibits, which the United States anticipates will not ultimately be contested issues.

In the alternative, for at least some of these records, the United States will offer the evidence pursuant to business records certifications, executed under Federal Rule of Evidence 902(11). These records are admissible under Rule 803(6) and Rule 902(11). Rule 803(6) allows the admission of what would otherwise be hearsay documents if they record a regularly conducted activity where: "(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge; (b) the records was kept in the course of a regularly conducted activity of a business, organization, occupation, or

calling…[;] (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11)…, [and] (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Fed. R. Evid. 803(6); *see also United States v. Brown*, 822 F.3d 966, 972 (7th Cir. 2016). Rule 902(11) provides that a certified record of regularly conducted activity is self-authenticating if the custodian or other qualified person does the certifying in compliance with a federal statute or Supreme Court rule. Here, the records have been certified and the certifications have been available to the defense through discovery. Furthermore, the government provided notice to defense counsel of its intention to rely on these business records certifications, along with a packet consolidating all business records certifications obtained in this case, in an email on February 27, 2024.

Not all of the government's exhibits constitute business records, however. If stipulations cannot be agreed upon, the government may call witnesses from the correctional institutions named above, as well as the South Milwaukee Police Department, to authenticate and establish the chain of custody for Jacobs' jail calls, emails, and letters, such as the ones previewed above, and other records evidence.

## III.    EVIDENTIARY ISSUES

The United States next presents herein a discussion of evidentiary issues likely to arise at trial in order to provide the Court and defense counsel with advance notice of the position the United States will take with respect to those issues.

**A. Rule 412 – Inadmissibility of Victims' Prior or Subsequent Sexual Conduct**

As discussed in the government's motion *in limine* on this issue (ECF 99), evidence of a victim's other sexual behavior or sexual predisposition is prohibited under Rule 412. *See United States v. Groce*, 891 F.3d 260, 266-67 (7th Cir. 2018); *United States v. Carson*, 870 F.3d 584, 592-97 (7th Cir. 2017); *United States v. Cephus*, 684 F.3d 703 (7th Cir. 2012); *see also United States v. Shankle*, 756 F. App'x 633, 634 (7th Cir. 2019). Even assuming Rule 412 did not apply, such evidence is irrelevant under Rule 402, and any arguable probative value would be vastly outweighed by the prejudicial effect, as balanced under Rule 403.

**B. Rule 801(d)(1)(A) – Use of Grand Jury Testimony as Substantive Evidence**

Four of Jacobs' named five victims, whom the government plans to call as witnesses during its case-in-chief, testified before the grand jury in this matter. Their relationship with Jacobs was the primary focus of their respective grand jury testimonies. In the event that a victim provides testimony inconsistent with her testimony before the grand jury, the government may introduce the prior testimony as substantive evidence. Such prior testimony is admissible under Rule 801(d)(1)(A), which provides that a statement is not hearsay if : "[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) inconsistent with the declarant's testimony, and was given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition." *See also United States v. Keeter*, 130 F.3d 297, 302 (7th Cir. 1997).

"Inconsistent" as used in this Rule is not "confined to statements [that are] diametrically opposed or logically incompatible." *United States v. Williams*, 737 F.2d 594,

608 (7th Cir. 1984). Inconsistency "may be found in evasive answers, . . . silence, or change in positions." *Id.* "[A] gap in the witness's recollection concerning the content of the prior statement does not preclude admission of the statement under the Rule." *United States v. DiCarlo*, 772 F.2d 1314, 1323 (7th Cir. 1985); *see also United States v. Gajo*, 290 F.3d 922, 932 (7th Cir. 2002) (a genuine lack of memory may be inconsistent with the prior testimony, "which naturally occurred closer in time to the actual events described."). Vague or incomplete responses can also trigger the use of prior inconsistent statements. *See United States. v. Distler*, 671 F.2d 954, 958 (6th Cir. 1981).

## C. Notice Under Rule 404(b)

The government hereby provides notice to opposing counsel and the Court, pursuant to Federal Rule of Evidence 404(b)(3), of certain evidence it intends to introduce at trial concerning Jacobs' communications while in custody between May 2021 and March 2023 with persons who are not the subject of any charge in the superseding indictment. Namely, the government will introduce select, representative examples of jail calls, emails, and letters made or written by Jacobs to various women concerning his desire that they engage in commercial sex acts and share the proceeds with him by depositing money into his jail or prison commissary accounts. These communications have all been provided in discovery, and the government will identify and provide the defense with copies, prior to trial, of the particular communications it intends to introduce.

The government believes that these communications constitute direct evidence of the crimes charged in the superseding indictment. With respect to the sex trafficking

charges in Counts One and Two, these communications include admissions by Jacobs that he is a pimp, and they provide corroborating evidence of Jacobs' fraud and coercion tactics that victims AV-1 and AV-2 will describe. With respect to the racketeering charges in Counts Five through Thirteen, they help establish the existence of the business enterprise involving prostitution that Jacobs is charged with promoting, managing, establishing, carrying on, and facilitating by his use of the mail and the Internet. Additionally, however, these communications are admissible pursuant to Rule 404(b)(2) to prove (at a minimum) Jacobs' motive, intent, plan, identity, and modus operandi.

### i. Statement of the law.

The Federal Rules of Evidence prohibit admission of evidence of an opposing party's other crimes, wrongs, or acts "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Evidence of other acts is nonetheless admissible where it tends to prove any relevant, non-propensity fact or condition, including but not limited to "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). While there must be some "propensity-free chain of reasoning" that establishes admissibility, it is not necessary that "other act" evidence be excluded simply because a propensity inference can also be drawn. *United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (en banc). Any relevant purpose other than proving the charged conduct based on a general propensity will suffice as a basis for admissibility. *United States v. Carson*, 870 F.3d 584, 599 (7th Cir. 2017) (citing *United States v. Robinson*, 161 F.3d 463, 467 (7th Cir. 1998)). Moreover, direct evidence of the charged offenses does

not implicate Federal Rule of Evidence 404(b), even if it concerns other uncharged wrongs or bad acts. *See, e.g., Carson*, 870 F.3d at 598; *United States v. Adams*, 628 F.3d 407, 414 (7th Cir. 2010).

> ii. **Admissibility as direct evidence of the crimes in the superseding indictment.**

The government submits that the proffered evidence is direct evidence of the crimes with which Jacobs is charged. First, these communications are replete with admissions that Jacobs is a pimp, that he believes that unpaid sex is "disgusting" and that everything should be "for a fee and not for free," and that his self-proclaimed "religion" is "FREE IS NEVER." He repeatedly talks about having accounts on prostitution advertisement sites like skipthegames.com and megapersonals.com and urges every woman he writes to "sell pussy." These admissions are directly relevant to the crimes in the superseding indictment.

On a somewhat deeper level, and relevant to the charges of sex trafficking by force, fraud, or coercion in violation of Section 1591(a)(1) and (b)(1) (Counts One and Two), these communications also showcase one of the primary methods Jacobs used to coerce and defraud his victims into engaging in commercial sex acts: He sold the victims a dream by making promises he had no intention of fulfilling.

This tactic appears ubiquitously across Jacobs' jailhouse communications with different women. Jacobs can be seen making strikingly similar representations and promises to each woman with whom he communicates, often using exactly the same or near-identical language with victim after would-be victim. Jacobs falsely assured each victim that, unlike the other women he was making money off of, he saw *her* as his

girlfriend and had true romantic feelings for her. Within weeks or even days, he convinced these vulnerable women using "love-bombing," attention, and feigned charm that he wanted to marry them when he was released from custody so that they could together enjoy the riches he assured the victims that they would quickly acquire with his guidance and tutelage, by performing commercial sex acts. He swore that he could connect his victims with "millionaire" sex customers who would "invest" in legitimate businesses that Jacobs would help the victims create and run. He also impressed upon his victims that a woman's job was to "help" her man, and that he had "stamped," or claimed, the victims as his property. He told each one that now was the time for her to take care of Jacobs, but that in the future Jacobs would take care of her. Meanwhile, he admitted to friends and family members in other jail calls that he was tricking these women into sending him money.

The communications are also direct evidence of Counts Five through Thirteen of the superseding indictment, which charge racketeering offenses in violation of 18 U.S.C. § 1952(a)(3) (the "Travel Act"). The Travel Act prohibits the use of facilities in interstate commerce to promote, carry on, or facilitate the carrying on of an unlawful activity. Section (b) of the statute defines an "unlawful activity" to include "any business enterprise involving ... prostitution offenses in violation of the laws of the State in which they are committed[.]" 18 U.S.C.1952(b)(1). The Seventh Circuit has construed the term "business enterprise" to require more than an isolated event. *See United States v. Clancy*, 175 F.3d 1021 (7th Cir. 1999) (citing *United States v. Muskovsky,* 863 F.2d 1319, 1327 (7th Cir. 1988)). Rather, to be a business enterprise, "the activities must be part of a 'continuous course of conduct." *Muskovsky,* 863 F.2d at 1327.

Here, the racketeering charges involve Jacobs' use of the mail and the Internet while incarcerated to promote and facilitate a business involving prostitution. Each count relates to a letter or email that Jacobs sent to one of two victims, AV-3 or AV-4, encouraging her to (or demanding that she) engage in acts of prostitution. Jacobs' communications with women other than AV-3 and AV-4 establish that Jacobs indeed intended this to be a business enterprise, and not an isolated event.

Jacobs relentlessly reached out to different women to encourage them to engage in prostitution, offering his assistance to facilitate the same by introducing the victims to potential customers, crafting advertisements and sales pitches for them, and suggesting rates. He urged them never to do anything, including having sex with anyone, without being paid for it. He further asserted that his coaching and management were so valuable that the women should compensate him for it by putting money on his books. Thus, Jacobs' efforts to persuade AV-3 and AV-4 to prostitute were not "isolated" incidents; he intended to carry on a business of managing prostitutes, and his communications in that vein with several different women over the course of years, some of whom are not named in the indictment, are evidence of his "continuous course of conduct."

Jacobs told his victims as much. For example, in an email from prison to a woman with the initials S.B., Jacobs describes his "family" (i.e., his stable of female prostitutes) as a group that "eats" and prospers together, and he instructs S.B. on how she can recruit more women to become part of his business. In a recorded call with his cousin, Jacobs is even more explicit that his promotion of prostitution is a business: he tells his

cousin that he has figured out how to "play these hoes," and that he is going to do "corporate pimping."

Therefore, Jacobs' many communications with and about the various women he was encouraging and helping to engage in prostitution are direct evidence of the sex trafficking and the racketeering charges alleged against him, and their admission does not implicate Rule 404.

### iii. Admissibility for permitted purposes under Rule 404(b)(2).

Alternatively, this evidence could also be admitted under Rule 404(b) for a number of permissible purposes, including proving Jacobs' motive, intent, plan, identity (as the author of the communications), and modus operandi. These purposes require no propensity inference to make them relevant, as articulated in *Gomez*.

Jacobs was in the business of making money by prostituting women using all means at his disposal—including force, fraud, and coercion while out of custody, and using similar cons over the phone, email, and mail while he is in custody—on a near-continuous basis for several years with various victims. His communications with non-testifying victims demonstrate, *inter alia,* that Jacobs' "sales pitch" to his victims was false and coercive. He repeats the same promises to victim after victim in order to persuade each woman to perform commercial sex acts, making it clear that his promise to any particular victim was not true or sincere. He is a con-man, and his repeated use of the same coercive and fraudulent statements and promises, to the victims named in the indictment and others unnamed, is evidence of the con. This evidence is certainly probative, and no more prejudicial than the other evidence showing that Jacobs was a

manipulative, abusive, and sometimes violent pimp.[9]

**D. Admission of Records of Conversations Between the Defendant and Third-Parties, and Exclusion of Defendant's Self-Serving Hearsay Statements**

At trial, the United States intends to introduce evidence of conversations between the defendant and third parties. Many of these conversations took place in the form of calls, emails, and text messages. In some cases, these conversations were with victims who will testify at trial. In other cases, these conversations were between the defendant and third parties who may not testify at trial.[10] The United States will seek to admit Jacobs' communications as non-hearsay statements of a party opponent under Rule 801(d)(2), and the replies of the other party to any conversations as necessary contextualizing information to give meaning to Jacobs' statements.

To the extent the defendant would seek to admit such conversations, however, he is precluded from doing so by the hearsay rules.

**i. Admissibility of the defendant's conversations when offered by the government.**

It is well settled that, for the government, a defendant's statements are admissible as non-hearsay statements of a party opponent. Fed. R. Evid. 801(d)(2); *United States v. Tolliver*, 454 F.3d 660, 665 (7th Cir. 2006) (holding that a defendant's "statements on the tapes constitute admissions by a party-opponent, and, as such, those statements are, by

---

[9] To reiterate, while the government believes the communications described in this subsection constitute direct evidence, and therefore do not implicate Rule 404, notice is hereby given, out of an abundance of caution, that the government intends to offer into evidence Jacobs' communications to and with non-testifying victims under the alternative theory that they constitute non-propensity 404(b) evidence. Specific exhibits that fall under this notice will be provided to the defense with the government's exhibit list, in advance of trial.

[10] Again, the government will provide, via its exhibit list, advance notice of the conversations it intends to introduce at trial so that any objections can be handled in advance of trial.

definition, not hearsay under Federal Rule of Evidence 801(d)(2)(A)"). It is also clear that a third-party's statements in a conversation with the defendant are admissible, not for the truth of the matter asserted, *see* Rule 801(c)(2), but to provide context for the defendant's portion of the conversation. *United States v. Van Sach,* 458 F.3d 694, 701 (7th Cir. 2006); *see also United States v. Simmons*, 582 F.3d 730, 736 (7th Cir. 2009); *United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009); *United States v. Nettles*, 476 F.3d 508, 517-18 (7th Cir. 2006); *see also United States v. Spencer,* Case No. 21-CR-253-PP, ECF 178 at 11-13 (E.D. Wis.).

In *Van Sach,* for example, the Seventh Circuit upheld the district court's ruling admitting recordings (both recorded phone calls and body wire) between the defendant and non-testifying informant. In so doing, the *Van Sach* decision specifically addressed the impact that *Crawford v. Washington* would have on such a statement (between a defendant and a non-testifying informant): *Crawford* "narrowed its holding to testimonial statements, explaining that the Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Id.* at 701. *See also United States v. Davis*, 890 F.2d 1373, 1379 (7th Cir. 1989) ("the admission of [the informant's] portion of the conversations do[es] not implicate [the defendant's] Sixth Amendment rights because the tape recorded statements were admitted for the limited purpose of placing [the defendant's] statements in context."); *United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002) (same); *United States v. McClain*, 934 F.2d 822, 832 (7th Cir. 1991) (same).

Similarly, in *Tolliver*, the Seventh Circuit rejected defense attempts to preclude audio recordings between a defendant and non-testifying confidential informant based

upon *Crawford v. Washington*. 454 F.3d at 665. The trial court held that the defendant's statements were non-hearsay under Rule 801(d)(2)(A) and found that the informant's statements were also non-hearsay because they were offered only to put the statements of the defendant in context:

> *Crawford* only covers testimonial statements proffered to establish the truth of the matter asserted . . . . In this case, as pointed out by the United States [the non-testifying informant's] statements were admissible to put [the defendant's] admissions on the tapes into context, making the admissions intelligible for the jury. Statements providing context for other admissible statements are not hearsay because they are not offered for their truth.

*Tolliver*, 454 F.3d at 665-66.

The same analysis applies here to conversations between Jacobs and his victims or other third parties, such as commercial sex buyers. The defendant's statements in these conversations are non-hearsay and admissible for their truth under Rule 801(d)(2)(A). The statements of the third parties are not offered for their truth, but rather are necessary for context because without those statements, the factfinder will be confused about the meaning and salience of the defendant's statements. Because they are not offered for their truth, the third-party statements are not hearsay. Fed. R. Evid. 801(c)(2).

For example, the defendant frequently posed as one of his victims to exchange messages with potential commercial sex customers via a messaging application called TextNow. The defendant's side of the conversation alone, however, would have little meaning without the buyers' portions of the conversations—for what and whom they were asking. In those conversations, the buyers are engaging in verbal acts (negotiating commercial sex acts), asking questions (which are not hearsay), or their statements are not otherwise being introduced for the truth of any matter asserted (e.g., that they would

prefer to see two girls at once or that a quoted price is too steep for them), but rather to give context and clarity to the nature of the defendant's communications with them.

As another example, the defendant frequently exchanged text messages with AV-1 in which he demanded to know where she was and made threats to injure her, call her probation officer on her, or expose her to her family as punishment for her failing to answer him or being "disobedient." In these conversations, AV-1's part of the exchanges will not be offered for the truth of any matters asserted, but rather to show the effect on the listener (the defendant) and to make sense of his words to her, which are admissible for their truth.

Thus, the United States will seek to admit evidence of entire conversations between the defendant and third parties, even if some of those third parties do not testify, for the truth of the matters the defendant asserts in them, and not the truth of any assertions made by the third parties.

### ii. Exclusion of the defendant's statements or conversations when offered by the defendant.

Rule 801(d)(2) does not work in the opposite direction, however, nor does it have a corollary for the defendant. In other words, should the defendant seek to introduce conversations between himself and third parties that he believes are exculpatory for the truth of the matters asserted—either by him or the third party—the hearsay rules prohibit their admission. *See United States v. Hamzeh*, 2019 WL 5395876 at *1 (Oct. 21, 2019) ("If the opponent—the defendant—seeks to admit his own statements, the Rule 801(d)(2) exception doesn't apply, and if the opponent is seeking to admit the statements for the

truth of the matters they assert, the statements meet the definition of hearsay under Rule 801(c).") (reversed on other grounds).

A defendant's statements are admissible for the truth under Rule 801(d)(2)(A) when the *government* seeks to introduce them because the defendant is the government's party opponent. He is not, of course, his own party-opponent, and neither are any of the government's witnesses, including the victims. Thus, neither his statements nor any witness's or victim's statements in conversation with him are admissible for the truth of the matter asserted when offered by the defendant, and this Court should exclude any such evidence if offered by the defendant for this purpose.

## IV. NOTICE UNDER RULE 609

Finally, the United States hereby advises the Court and counsel that if defendant Montae D. Jacobs chooses to testify at trial, the United States will seek to impeach him pursuant to Federal Rule of Evidence 609 with the fact of the following felony convictions:

1. Battery By a Prisoner, in Waukesha County Circuit Court Case No. 2021CF1904;

2. Possession of a Firearm by a Felon, in Milwaukee County Circuit Court Case No. 2021CF3024;

3. Manufacture/Deliver Cocaine, in Waukesha County Circuit Court Case No. 2019CF528;

4. Vehicle Operator Flee/Elude Traffic Officer, in Milwaukee County Circuit Court Case No. 2010CF0299;

5. Possess with Intent Cocaine, in Milwaukee County Circuit Court Case No. 2009CF519.[11]

---

[11] The Seventh Circuit has found that the ten-year look-back clock for purposes of Federal Rule of Evidence 609 starts at the witness's release from any physical confinement. *United States v. Rogers*, 542 F.3d 197, 201 (7th Cir. 2008). Although the Seventh Circuit has not yet ruled on whether the revocation of probation stops the clock, the Fourth and Ninth Circuits have found that it does. *See*

## V.    CONCLUSION

This memorandum is offered as an aid to the Court and to provide notices to the Court and the defense under Rules 404 and 609.

Dated at Milwaukee, Wisconsin, this 20th day of March, 2024.

<div style="margin-left:40%">

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By:    *s/ Kate M. Biebel*
KATE M. BIEBEL
Kate M. Biebel WI Bar Number 1091126

*s/ Erica J. Lounsberry*
ERICA J. LOUNSBERRY
Erica J. Lounsberry FL Bar Number 86095

Assistant United States Attorneys
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202
Tel: (414) 297-1700
Email: kate.biebel@usdoj.gov
Email: erica.lounsberry@usdoj.gov

</div>

---

*United States v. Gray*, 852 F.2d 136, 139 (4th Cir.1988); *see also United States v. McClintock*, 748 F.2d 1278, 1288 (9th Cir. 1984). So, too, has a district court in this circuit. *See United States v. Elder*, No. 3:13-CR-00017-RLY, 2015 WL 1403270, at *1 (S.D. Ind. Mar. 26, 2015). While the Ninth Circuit requires that the charge generating the probation violation be similar to the charge in the original conviction, *see McClintock*, 748 F.2d at 1288, the Fourth Circuit does not impose that limitation, *see Gray*, 852 F.2d at 139, and neither did the Southern District of Indiana, *see Elder,* 2015 WL 1403270, at *1. Jacobs' convictions in Milwaukee County Case Nos. 2010CF0299 and 2009CF519 fall within the ten-year look-back window if his revocations in those cases are considered.