UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                  Case No. 22-CR-91-LA

MONTAE D. JACOBS,

        Defendant.

---

**UNITED STATES' SENTENCING MEMORANDUM**

---

The United States, by its attorneys, Gregory J. Haanstad, United States Attorney for the Eastern District of Wisconsin, and Erica J. Lounsberry and Kate M. Biebel, Assistant United States Attorneys, hereby submits the following sentencing memorandum. On April 5, 2024, after a three-day bench trial, the Court convicted Montae D. Jacobs of two counts of Sex Trafficking by Force, Fraud, or Coercion, one count of Sex Trafficking of a Child, one count of Obstruction or Interference with Sex Trafficking Enforcement, eight counts of Use of Facilities in Interstate Commerce to Carry On a Prostitution Business, and one Count of Coercion or Enticement. The government offers this memorandum to highlight certain evidence and factors for the Court's consideration, in support of its request for a sentence of 264 months of imprisonment—a sentence that, as explained more fully below, is consistent with those imposed by this Court and others in this District in recent sex trafficking cases.

**I.    INTRODUCTION**

The evidence presented at trial proved conclusively that between his release from prison in January 2019, and the hearing on the motion to revoke his communication privileges in this matter,

1

held April 25, 2023, Jacobs relentlessly—and without hesitation or remorse—lured, recruited, pimped, and trafficked numerous women and girls for commercial sex. The evidence of the broader investigation into Jacobs' conduct, summarized in the presentence investigation report, demonstrates that Jacobs' pimping activities have pervaded the last decade of his life—whether Jacobs was in custody or out, on supervision or not, and even when he was already under federal indictment for sex trafficking. While Jacobs may not have been as violent as some other traffickers this Court has sentenced, or as financially successful, the longevity of his criminal activities and his unusual degree of persistence in the face of criminal justice sanctions suggest a significant prison sentence is both appropriate and necessary.

The government submits that a sentence of 22 years in prison (264 months) would adequately protect the community from future crimes of the defendant, as well as provide general deterrence for similar conduct by others. In making this recommendation, the United States has attempted to balance mitigators, such as the fact that Jacobs was not "hands on" with several of his victims, against aggravators, including his significant criminal history, the lasting impact of his crimes on his victims, and his apparent imperviousness to deterrence. Taking all of this into account, the government believes that a 22-year sentence would be sufficient but not greater than necessary to accomplish the primary goals of sentencing.

## II.  APPLICABLE LAW

In determining the appropriate sentence, the Court must consider the factors set forth in 18 U.S.C. § 3553(a). *United States v. Harris*, 490 F.3d 589, 593 (7th Cir. 2007). These factors include the nature and circumstances of the offense and the history and characteristics of the defendant; the Sentencing Guidelines range; and the need to avoid unwarranted disparities among similarly situated defendants. Ultimately, the Court must impose a sentence sufficient, though not greater

than necessary, to reflect the seriousness of the offense, promote respect for the law, adequately punish the crimes committed, deter other criminal conduct, protect the public from the defendant, and provide for any particularized needs of the defendant. 18 U.S.C. § 3553(a)(2).

In determining a just sentence, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited as to the kind of information he may consider, or the source from which it may come." *United States v. Jones*, 635 F.3d 909, 917 (7th Cir. 2011) (quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972)). A judge has broad authority to consider any information about a defendant unless specifically prevented from doing so by law. *United States v. Perez*, 956 F.3d 970, 976 (7th Cir. 2020). *See* U.S.S.G. § 1B1.4. This principle is echoed in 18 U.S.C. § 3661, which states that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." *See United States v. Mansfield*, 21 F.4th 946, 956 (7th Cir. 2021).

### III.    SUPPORT FOR THE GOVERNMENT'S RECOMMENDATION

Because Jacobs was convicted at trial based on lengthy testimony, the presentation of numerous exhibits, and Jacobs' own admissions, and due to the thorough nature of the PSR in this case, the Court already has ample information upon which to assess the nature and circumstances of Jacobs' crimes. Rather than providing yet another summary of each victim's testimony, the government will highlight some of the aggravating factors supporting its recommendation.

Based on the seriousness of the offenses of conviction, and the significant impact on each victim, the government could fairly argue that a sentence of thirty years in prison (the low end of Jacobs' recommended U.S. Sentencing Guidelines sentence) or even forty years in prison (the minimum mandatory penalties for each of the three sex trafficking offenses for which Jacobs was

convicted, stacked) would be just. The government, however, is tempering its recommendation in an effort to find a sentence that is proportional to other sentences given to other traffickers in this District, accounting for the key facts most susceptible to direct comparison, including the duration of the offenses, the total number of victims, the degree of physical violence involved, and Jacobs' criminal history, as discussed later in this memorandum. That said, Jacobs' dogged denials of any wrongdoing—even while admitting to the elements of many of the crimes with which he was charged—raise significant concerns that Jacobs will resume similar criminal behavior upon release from custody. The government submits that a sentence of 22 years in prison would appropriately account for all of these factors and concerns and would address the sentencing goals the Court is required to weigh pursuant to § 3553(a)(2).

### A. Nature and Circumstances of the Offense

#### 1. Prolonged nature of the criminal conduct.

While the sex trafficking statute can be violated by a single instance of a defendant causing or attempting to cause a victim to engage in a commercial sex act by prohibited means, Jacobs' conduct here far exceeds the minimum required to prove that crime, or to earn the base offense level of 34 set forth in U.S.S.G. § 2G1.1(a)(1). Jacobs' crimes were not one-time mistakes, poor decisions, or actions taken in the heat of the moment. His were not mere crimes of opportunity; rather, he systematically recruited and exploited a series of vulnerable young women over a period of four years (or nine, counting relevant conduct).

Arguably, the most egregious aspect of Jacobs' conduct was his sheer relentlessness. While Jacobs did not manage to retain every victim for as long as he did AV-1, he continually pursued new recruits—even after being put on notice that he was under investigation for, and later charged with, sex trafficking. Jacobs' first trafficking-related arrest was in 2014 (*see* PSR ¶¶ 91, 196). After

he was not charged for that offense (though he was revoked from supervision on another case), he immediately began pimping another victim, E.W. (*see* PSR ¶¶ 92-95), then another, B.S., whom he recruited while E.W. was briefly in custody (*see* PSR ¶¶ 95-100). When Jacobs was caught with both victims in a Racine County Human Trafficking Task Force sting operation in May 2015, he was arrested for human trafficking but once again not ultimately charged. Jacobs nevertheless remained in custody for over two years, until mid-August 2017, due to violations of probation.

In spite of these arrests, or perhaps emboldened by the fact that he was not charged, Jacobs again resumed trafficking women after his release. In March 2019, Jacobs began pursuing AV-1, at which time he was already exploiting J.J. *See* PSR ¶¶ 103-104. Although Jacobs spent the latter half of that year and all of the next in custody, he picked right back up where he left off when he was released in December 2020, adding AV-2 to the mix in April 2021.

Most tellingly of all, however, Jacobs kept right on trying to recruit additional victims after his arrest for possessing a firearm and violations of probation in May 2021. He turned first to JV-1 and her sister, whom he had already begun pimping (or at least attempting to) alongside AV-1 in the spring of 2021. Rapidly, he accumulated contact information for numerous women known to fellow inmates or pulled from online escort ads, and he began reaching out to them unabashedly, often multiple times a day, selling them a life of riches and ease if they would make him their "king," "submit" to him, and, most especially, make him money, his way. Even when undersigned counsel reached out to Jacobs' counsel to put Jacobs on notice that his actions violated federal law, Jacobs continued to pursue new victims, all day every day. Indeed, had more of Jacobs' victims been identified or resided in the Eastern District of Wisconsin, the government would likely have superseded with many more charges than it did.

Even as recently as two weeks before the filing of this memorandum, it appeared Jacobs was continuing to attempt to recruit women to prostitute for him. While listening to jail calls of another federal inmate at Ozaukee County Jail, investigators identified a call from July 14, 2024 between this inmate and his girlfriend, wherein they discussed how Jacobs, who had been swapping PIN numbers with this inmate and relaying messages on the inmate's behalf, had attempted to recruit that inmate's girlfriend to work for Jacobs. At the outset of the call, the inmate had to reassure his girlfriend that it was him calling this time, not "P" or "Max" (known aliases for Jacobs, with "P" standing for "pimp"). The other inmate urged his girlfriend that she needed to be clear with Jacobs that she was not interested in prostituting for him, and the girlfriend affirmed that she had been. The inmate then complained the Jacobs was constantly trying to ask him and other inmates for women's numbers—or to know whether their girlfriends had friends who might talk to Jacobs. The inmate grumbled that he did not "talk to prostitutes" and that Jacobs knew this, however Jacobs continued to press the issue, asking things like, "They wanna make some money? They wanna make a [sic] ad?" Thus, it is apparent that the very behavior of which Jacobs has been convicted and is waiting to be sentenced continues unchecked.

Simply put, the prolonged duration of Jacobs' trafficking in this case, and his imperviousness to deterrence after arrests, indictment, conviction, and incarceration, indicate that he has no intention of stopping. He essentially said as much during his trial testimony, stating his belief that his conduct was not unlawful sex trafficking but just a pimping business involving desperate women who had nowhere else to turn and no dreams of their own. In reality, Jacobs was a manipulative, abusive, and at times violent trafficker of young women, and his sentence must reflect the seriousness of his conduct.

## 2. Ages of Jacobs' victims.

Jacobs' advisory sentencing guideline range in this case is driven largely by his counts of sex trafficking by force, fraud, or coercion. Importantly, however, Jacobs also attempted to sexually exploit a minor, and there were several instances in which Jacobs capitalized on his victims' youth and inexperience to take advantage of them. The prime example is, of course, JV-1, who was 17 years old when the then 30-year-old Jacobs communicated with her from prison, encouraging her to get drunk so that she could stomach performing sex acts for money with AV-1's regulars (as AV-1 was incarcerated at the time), who were in their 50s and 60s. Moreover, the evidence introduced at trial demonstrated conclusively that Jacobs knew JV-1's age when he communicated with her, but that he nevertheless was increasingly direct with her about prostituting and creating pornography. JV-1's older sister, M.W. (PSR ¶¶ 101-102), whom Jacobs attempted to sell for sex before he went into custody, was only 19 years old. And while Jacobs was in his mid-20s when he pimped B.S. and E.W. in late 2014 and 2015 (PSR ¶¶ 92-100), the women were just 18 years old and 19 years old, respectively. Jacobs' selection of young, vulnerable victims is another aggravating factor counseling in favor of a significant sentence.

## 3. Varied control tactics.

Moreover, Jacobs has admitted that he targeted women specifically for their vulnerabilities. In the lead-up to trial, Jacobs wrote this Court a plethora of letters in which he described and defended his tactics, predicated on his purported "religion" that "free is never." In one such letter, dated December 12, 2023, he wrote, "I could never address a professional woman to sell sex rather [likely misstatement of "whether"] if she had multiple sex partners or not, it's just different strokes for different folks." Tr. Exh. 171. Nonetheless, he confided to a woman he attempted to recruit

7

while in custody, "It's complicated but not impossible entice and knock a bi$ch." Tr. Exh. 67. This is because Jacobs understood full-well how to effectively select and groom his prey. He deliberately sought out victims who were in difficult life circumstances—easily manipulable based on their addictions and their problems with the criminal justice system, and lacking basic necessities. As Jacobs acknowledged in another letter to the Court, written on June 12, 2023, many of the women he targeted were "already 'off-balance'" and that they were "looking for insight, guidance, sense, support, ANSWERS TO THEIR QUESTIONS," which, with all the charisma and contrived authority of a cult leader, he purported to exclusively possess. At trial, he reemphasized his tactic of targeting vulnerable women, saying, for example, that "hos" want to be sold dreams because they don't have any of their own, and with respect to AV-3, that she should have succumbed to his pressure of her to move to Texas to engage in commercial sex because she did not have stable housing in Milwaukee. When asked pointedly whether he purposely targeted vulnerable women, Jacobs responded that yes, he did. But he quickly added, demonstrating a practiced apathy toward the suffering of others, "the choice is theirs."

Jacobs also admitted in a letter to his mother dated June 5, 2022, "I do have a gift of gab. I know that conversation rules the nation. I know a lot of hoes like to be sold dreams." Tr. Ex. 95. And he did, indeed, use that "gift" to offer his victims false hopes that he tailored to their unique circumstances: of a romantic relationship, a stable home, wealth, the opportunity to be reunited with their children—whatever they were lacking or wanted most. He told them each they were his one and only, passing off his victims to one another as his "cousins" or mere cash cows who were disposable.

Instead, the victims quickly found themselves, day and night, at the mercy of Jacobs' tempers, whims, and greed. The smallest transgression or irritation would result in a deluge of

8

threats that Jacobs could, in an instant, take away everything the victims believed they were working for unless they conformed their behavior to his demands. Myriad examples of these dramatic outbursts were captured in trial exhibits taken from Jacobs' and AV-1's phones. On occasions when AV-1 did not reply quickly enough to Jacobs' messages, took too long on a date, or missed a money call, Jacobs made credible threats to everything important to AV-1: her relationship with her family, the roof over her head, her physical safety, and her liberty. Tr. Exhs. 99, 102, 103, 146, 147. He belittled AV-1 using words like "ho" and "disobedient ass bitch," and he emphasized his absolute power over her life, telling her, "Ima ruin you unless I feel otherwise." Tr. Exhs. 99, 147.

But Jacobs did not stop with threats. He resorted to physical violence against AV-1 more and more over time, slapping her, punching her, pulling her by her hair, and leaving her with visible injuries. Meanwhile, Jacobs showed AV-2 he meant business by leaving her barricaded in a hotel room overnight with an associate who had recently shot his girlfriend and was wanted by the police.

Another form of control Jacobs exercised over his victims was control over their physical needs, including their needs for food, rest, and the drugs to which they were addicted. Jacobs supplied or deprived the victims of these things based on his pleasure or displeasure with their performance, ensuring that the victims remained entirely dependent on him, and thus that he remained entirely in control of them.

This sadistic manipulation is how Jacobs proudly earned his livelihood. As he told one of his recruits while in prison, "Im not no rookie and everything I got came from pussy!" Tr. Exh. 72. Jacobs is a skilled manipulator who identifies and preys on desperate women's vulnerabilities, and he does so not only without remorse, but with pride. It's a skill he has developed and honed

over time, even from prison. As with the factors highlighted above, this factor is an indication that he has not and will not be deterred from returning to trafficking; therefore, a significant sentence is necessary to protect the public from him.

### 4. Attempts to obstruct justice.

Jacobs also tried to get away with his crimes by repeatedly attempting to obstruct justice. At trial, the Court saw and heard about dozens of Jacobs' letters and calls to and about AV-1, trying to obtain a false recantation affidavit from her by means of pressure, deception, and outright bribery. Jacobs attempted to involve AV-2, AV-3, and JV-1, having them reach out to AV-1 under false pretenses in order to get AV-1 to take back her statements and resume making money for Jacobs. He even asked his mother and sister to deposit money into AV-1's jail commissary account to persuade her to recant. Once Jacobs knew he had been federally indicted, he had his associate "Cookie" reach out to AV-1 on Facebook to interrogate her about her cooperation with law enforcement and ensure that it would stop.

Arguably, these efforts continued all the way through the trial in this case. At numerous points while the victims testified, Jacobs audibly (sometimes under his breath, and sometimes vociferously) made commentary directed at the victims. These included name-calling, insults, and accusations that the victims were lying. As the government noted during the trial, even Jacobs' quieter attacks were amplified by the microphone at the defense table and clearly audible to the victims through the speaker positioned on the witness stand. These retorts were plainly designed to rattle, intimidate, trigger, and otherwise derail the victims' testimony. In addition to an utter lack of respect for the victims or the court process, this unacceptable behavior also highlights Jacobs' remorseless attitude and his inability to conform his conduct to the requirements of the law or the most basic or ordinary expectations of a civilized society.

Jacobs' years of trafficking, his continued attempts to recruit victims from prison, and his absolute lack of remorse at trial—even after hearing directly from the victims about the pain he caused them—all point to the inescapable fact that Jacobs is an incorrigible menace who must be incarcerated for a significant period of time to stop (or at least make more difficult) his continued exploitation of vulnerable women for his profit.

### B. History and Characteristics of the Defendant

#### 1. Jacobs' prior record.

Besides the base offense level for sex trafficking by force, fraud, or coercion, the other major factor driving Jacobs' advisory sentencing guideline range is his criminal history. Jacobs is no stranger to the criminal justice system, and his numerous arrests and convictions, summarized in paragraphs 180 to 201 of the Revised PSR, contribute heavily to this range. In fact, although Jacobs' adjusted offense level is 41, even at a level 37—a full 4 points lower—the recommended range for his sentence would still be 30 years to life, due to his criminal history category. His category is, of course, based at least indirectly on the nature of his prior offenses, as reflected by the serious punishments he received for some of them that, unfortunately, did little to deter him from committing additional—even escalating—criminal conduct.

Jacobs' past cases have included a wide variety of charges—from drug offenses, to gun and violent crimes, to a fleeing case in which Jacobs seriously injured the occupants of a vehicle he struck. His arrests began when he was 17 and have continued through at least 2023 (when Jacobs was 33 years old), including Jacobs picking up both state and federal felony charges during his current period of incarceration. Indeed, even when he has not been charged criminally, Jacobs has continued to engage in additional antisocial behavior while in prison up (beyond his

11

continuation of his sex trafficking scheme) through the present, including exposing himself to a female corrections officer during the trial in this case.

Moreover, the government's investigation has revealed that since at least 2014, in between Jacobs' periods of incarceration for his past cases, he has continuously engaged in drug distribution, pimping, and sex trafficking, sometimes beginning the same day as his release. Prior to the filing of the instant case, Jacobs had two arrests for pimping and human trafficking in 2014 and 2015 respectively. Indeed, new arrests and other violations caused Jacobs to have his supervision in the fleeing case (10CF299) revoked no less than four times, finally resulting in the prison sentence during which Jacobs committed the offenses of which he was found guilty in Counts Three through Fourteen of this case.

Jacobs' past sentences have included many different types of punishments, from fines, to probation, to jail time, to significant prison time with extended supervision. These sanctions have also included treatment, including multiple forms of mental health counseling. None of these have deterred him from committing new crimes. In fact, the Wisconsin Department of Corrections prepared a troubling summary of Jacobs' actions and attitudes while in custody in 2020 and 2021, concluding that he had been diagnosed with, among other things, antisocial personality disorder, which is also known as sociopathy. *See* PSR ¶ 222. People with this condition exhibit a variety of symptoms closely associated with criminal behavior, including ignoring distinctions between right and wrong, exhibiting disrespect for others, using manipulation tactics for personal gain, taking dangerous actions with no regard for the safety of others, acting out aggressively or violently, and ultimately feeling no remorse after harming others. Mayo Clinic, *Antisocial personality disorder*, https://www.mayoclinic.org/diseases-conditions/antisocial-personality-disorder/symptoms-causes/syc-20353928 (last visited July 3, 2024). All of these symptoms are manifestly present in

this case. Indeed, Jacobs has not missed a beat, whether in custody or out, and has continued to engage in serious criminal conduct that does severe physical, psychological, and emotional damage to his victims, even despite knowing he was under investigation, facing revocation or possible new charges, or even with a pending case.

This type of extraordinary resistance to correction or rehabilitation militates in favor of a stronger prison sentence. While it is true that Jacobs could theoretically continue to offend from custody, as he did continuously between 2021 and 2023, having Jacobs in custody provides a greater measure of protection for the public than having him in physical proximity to his victim pool in the community, and the correctional setting allows for a higher probability of detection and ability to deal swiftly and appropriately with future misconduct.

### 2. Jacobs' trial testimony.

Jacobs exercised his right to testify at trial. Although he now claims that the government "tricked [him] on the stand" (Dkt. 124, p. 3) into admitting guilt to most of the charges in the superseding indictment, the truth is Jacobs has long admitted those facts in his correspondence with women and his letters to the Court without any regret—until the braggadocio resulted in multiple felony convictions. Every question put to Jacobs on cross examination was taken directly from the evidence introduced at trial—typically Jacobs' own words in text messages, letters, calls, or emails to various victims or the Court—and had one or more exhibits to back it up. Jacobs began by freely admitting he was a pimp. *See, e.g.*, Tr. Exhs. 34, 70, 87, 88, 169, 102. And he admitted that, as far as he was concerned, "P.I.M.P." stood for "Put In My Pocket," a reference to the money his victims earned for him. Tr. Exh. 171. He also agreed that he had "blown through" so many "hoes" that he had "lost count." Tr. Exh. 56. He acknowledged sending all of the disturbing threats to AV-1, to lying to his victims, and to exhorting women to bow down to him. Jacobs did not deny

13

any of this, but instead sought to minimize or explain away the criminal character of his actions with excuses about "ebonics," "urban culture," the First Amendment, his lawyer's performance, alleged government corruption, and a litany of faults he found with the victims he used and abused. *See*, *e.g.*, Dkt. 110, 124.

Jacobs' words, on the stand and in his letters, are an important part of what the Court should consider when assessing his character. *See*, *e.g.*, *United States v. Stewart*, 686 F.3d 156, 166 (2d Cir. 2012) (noting that a district court may consider what a defendant has said—in public, in private, or before the court—at sentencing, when looking at his history and personal characteristics). They strongly demonstrate Jacobs' lack of remorse, an attitude of incorrigibility—that is, a total refusal to be reformed or corrected, or to learn from past mistakes. These traits all strongly support the 22-year sentence the government is requesting.

C. **Balancing the Primary Criminal Justice Objectives**

1. **Protecting the public, reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment.**

The seriousness of Jacobs' conduct was made clear at trial. His manipulation and abuse of his victims was described in detail not only by the victims themselves, but by Jacobs' own words through his text messages, letters, and ultimately his own trial testimony. That evidence showed Jacobs to be someone who will stop at nothing to advance his goal of earning riches through the commercial sex industry. He admitted on the witness stand that he specifically targeted vulnerable women to work for him, and that he sold them dreams in order to keep them under his thumb and working at his direction. The lasting effect of Jacobs' abuse on his victims was visceral; this Court witnessed the emotional impact Jacobs' actions had on his victims as they relived Jacobs' abuse for hours on the stand. These victims believed Jacobs when he promised he was going to improve their lives. Instead, Jacobs left them in far worse circumstances, damaging their physical and

psychological health. In short, Jacobs' impact on his victims has been and will continue to be life changing. And Jacobs, having heard his victims testify about the pain he caused that still haunts them, does not believe his conduct was wrong. In essence, he testified that the victims deserved the blame for what he did to them, because they were at low points in their lives and thus susceptible to his manipulation. He has no remorse, he has not accepted responsibility, and he has shown no signs he ever intends to stop.

### 2. Providing adequate deterrence.

Jacobs' conduct requires a sentence that will provide not only specific deterrence to him (if, indeed, he is even amenable to changing his ways), but general deterrence to others who would engage in similar conduct. Given particularly that he has never taken responsibility for his wrongs, and that he subjected his victims to a traumatic confrontation with him in court, a sentence well above the minimum mandatory is necessary. Indeed, a sentence in this case must signal to other would-be traffickers the seriousness of such misconduct, and signal to other trafficking defendants the importance of taking responsibility for their actions.

Although it is true that the sheer availability of high maximum sentences on charges like sex trafficking offers some measure of deterrence, that deterrent effect is diminished if strong sentences are rarely imposed. *See United States v. Newmann*, 965 F.2d 206, 210 (7th Cir. 1992) ("Since punishment is discounted by the probability of its being imposed-even a criminal of minimum rationality will prefer to commit a crime that carries a mandatory life sentence if the probability of his being caught and punished is .01 rather than .99-a skillful criminal requires a longer sentence than an inept one to be deterred from committing future crimes."). It is therefore the cumulative weight of sentences *imposed*—rather than sentences *available*—that speaks the

loudest. *See United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) ("Sentences influence behavior…").

### 3. Avoiding unwarranted sentencing disparities.

The avoidance of unwarranted disparities is part of the reason Congress established the sentencing guidelines. *United States v. Gall*, 552 U.S. 38, 54 (2007); *see also United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) (holding that a guideline sentence necessarily avoids unwarranted disparities and fully complies with § 3553(a)(6)). In this case, the U.S. Sentencing Commission, via the Guidelines, recommends that the Court sentence Jacobs to between 30 years and life in prison. The United States recognizes that by recommending a sentence of 22 years, it is encouraging the Court to sentence Jacobs to a term of imprisonment below that recommended by the Guidelines. Its primary motivation in doing so, however, is to acknowledge that a sentence of 22 years' imprisonment would be proportional to sentences received by other sex trafficking defendants who have been tried and convicted in this District.

Between 2015 and the present, sentences for sex trafficking defendants who have pled guilty to sex trafficking—either of a child or by force, fraud, and coercion—in this District have ranged from 10 to 27 years in prison, and defendants who were convicted after jury trials have received sentences ranging from 20 to 45 years in prison. With the exception of Tyrone McMillian (11-CR-193), who was resentenced to 15 years in prison (down from 30 years) after an appeal, no defendant who has been found guilty of sex trafficking in this District without accepting responsibility—that is, no sex trafficking defendant who has been found guilty at trial—has received a sentence of only the minimum mandatory.

Though it can be difficult to compare and balance the complex facts of one sex trafficking case against another's, certain factors such as the number and ages of the victims, the type and

16

degree of force, fraud, or coercion used, and the offender's criminal history make useful points of comparison. The government believes that the sentences given to two defendants in particular, Jovante Champion and Terrell Shankle, serve as helpful references and demonstrate the appropriateness of the government's recommendation here.

In *United States v. Jovante Champion* (21-CR-57), Champion was charged with trafficking one minor and one adult for commercial sex and transporting them in interstate commerce for the purpose of prostitution between Milwaukee, Chicago, Nashville, and Dallas. The offenses all occurred with a period of about six weeks. Champion's criminal history category was I, and his advisory sentencing guidelines range was 24 to 30 years in prison. After he was convicted of all offenses at trial, the government recommended, and the Court sentenced Champion to, 20 years in prison.

In some ways, Champion and Jacobs' conduct was similar. While Jacobs did not travel to other states with his victims, he exercised similar forms and degrees of control over his victims, including false promises, emotional manipulation, threats of physical violence. Both defendants also relied on associates to help them establish and maintain this control. Notably, however, Champion had fewer victims than Jacobs, did not attempt to engage in witness tampering or obstruction, did not testify falsely or cause disturbances at trial, and had never served time in prison (let alone continued to commit felony offenses while in prison). In almost all respects, therefore, Jacobs' conduct was more aggravated than Champion's, suggesting a stronger sentence would be more appropriate for him.

In *United States v. Terrell Shankle* (16-CR-111), by contrast, the defendant was convicted, following a jury trial, of five counts of sex trafficking of a child and by force, fraud, or coercion, and one count of interstate transportation for prostitution. These crimes occurred over a period of

six years. Due to the number of victims (most of whom were minors), Shankle's use of violence, and Shankle's criminal history (which was comparable to Jacobs' criminal history), Shankle's recommended Guidelines sentence was life in prison. Indeed, the government sought a sentence of life in prison, however this Court ultimately sentenced Shankle to 25 years.

Neither Shankle nor Jacobs has ever accepted responsibility for the crimes they committed, and both defendants retraumatized multiple victims by forcing them to relive the abuse publicly. While the frequency and severity of the violence Shankle used against his victims sets him apart from Jacobs, Shankle also was not charged with obstruction and did not continue to engage in sex trafficking while in pretrial detention, as Jacobs has been found guilty of doing.

The government therefore believes that a sentence of 22 years—more than what Champion received with no criminal history, fewer victims, and only six weeks of conduct, but less than what Shankle received for more violent conduct involving a greater number of minor victims—would be proportional to these and other sentences imposed on sex traffickers in this District.

### D. The Importance of the Section 3553(a) Factors Relative to the Advisory Sentencing Guidelines Calculation

Finally, the government also acknowledges that the calculation of the sentencing guidelines for a sex trafficking defendant, and perhaps Jacobs in particular, can be complicated. As the Court likely perceives from the Revised PSR and its addendum, certain questions regarding the application of the Guidelines to the facts of Jacobs' case, including relevant conduct and his criminal history score, are nuanced. As highlighted throughout this memorandum, the government's sentence recommendation—which is far below what it believes to be the defendant's applicable Sentencing Guidelines range—is driven, instead, by application of the Section 3553(a) factors.

The government requests that if the Court finds that it would impose the same sentence regardless of the defendant's Guideline range, based instead on application of Section 3553(a) factors, that the Court make a record of this fact, along with its specific reasons for that decision. *See United States v. Asbury*, 27 F.4th 576, 581-82 (7th Cir. 2022) (holding that "inoculating statements" regarding a sentence's relationship to the calculated guideline range are only effective if the statement is detailed both with respect to any contested guideline and as to why the potential discrepancy would not affect the court's ultimate decision).

## IV. CONCLUSION

For the reasons set forth above, and after careful consideration, the government submits that a sentence of 264 months in prison is sufficient but not greater than necessary to promote respect for the law, provide just punishment, deter other would-be sex traffickers, and protect the public. Counsel for the government will make additional remarks at the sentencing hearing.

Dated at Milwaukee, Wisconsin, this 1st day of August, 2024.

Respectfully submitted,

GREGORY J. HAANSTAD
United States Attorney

By: *s/ Erica J. Lounsberry*
ERICA J. LOUNSBERRY (FL Bar No. 86095)
KATE M. BIEBEL (WI Bar No. 1091126)
Assistant United States Attorneys
Office of the United States Attorney
Eastern District of Wisconsin
517 E. Wisconsin Ave., Room 530
Milwaukee, WI 53202
Tel: (414) 297-1700